JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

05 CV 6516

———————————————————— x

CENTRAL LABORERS' PENSION FUND,
Derivatively on Behalf of MORGAN
STANLEY,

                Plaintiff,

    vs.

PHILIP J. PURCELL, EDWARD A.
BRENNAN, STEPHEN S. CRAWFORD, SIR
HOWARD J. DAVIES, JOHN E. JACOB, C.
ROBERT KIDDER, CHARLES F. KNIGHT,
JOHN J. MACK, JOHN W. MADIGAN,
MILES L. MARSH, MICHAEL A. MILES,
LAURA D'ANDREA TYSON, KLAUS
ZUMWINKEL, DONALD KEMPF and
KIRKLAND & ELLIS,

                Defendants,

    – and –

MORGAN STANLEY, a Delaware
corporation,

           Nominal Defendant.

———————————————————— x

: Civil Action No.
:
: VERIFIED SHAREHOLDER'S
: DERIVATIVE COMPLAINT FOR
: VIOLATIONS OF §§14(a) AND §10(b) OF
: THE SECURITIES EXCHANGE ACT OF
: 1934, INTENTIONAL AND/OR
: NEGLIGENT BREACH OF FIDUCIARY
: DUTIES, WASTE, UNJUST ENRICHMENT,
: RESCISSION, ABUSE OF CONTROL,
: GROSS MISMANAGEMENT,
: PROFESSIONAL NEGLIGENCE, LEGAL
: MALPRACTICE AND AIDING &
: ABETTING
:
:
:
:
:
:
:
:
: DEMAND FOR JURY TRIAL



RECEIVED
JUL 19 2005
U.S.D.C. S.D. N.Y.
CASHIERS

*"Quis Custodiet Custodies?"*
*"But Who Will Guard the Guards Themselves?"*

*Juvenal*

1.      Plaintiff, by its attorney, submits this Shareholder's Derivative Complaint for Intentional and/or Negligent Breach of Fiduciary Duties, Waste, Unjust Enrichment, Abuse of Control and Gross Mismanagement (the "Complaint") against the defendants named herein as follows:  Philip J. Purcell, Edward A. Brennan, Stephen S. Crawford, Sir Howard J. Davies, John E. Jacob, C. Robert Kidder, Charles F. Knight, John J. Mack, John W. Madigan, Miles L. Marsh, Michael A. Miles, Laura D'Andrea Tyson, Klaus Zumwinkel, Donald Kempf and Kirkland & Ellis.

## SUMMARY OF THE COMPLAINT

2.      This lawsuit arises out of years of gross mismanagement, abuse of control and fraud in the purchase and sale of the stock of Morgan Stanley ("Morgan Stanley" or the "Company") and the use of false and misleading proxy statements by its Chairman/CEO Philip J. Purcell ("Purcell"), several members of Purcell's management team, and Purcell's hand-picked, crony-laden Board of Directors.  After Purcell's hand-picked Board passively tolerated years of poor business and stock performance and a massive exodus of Morgan Stanley's top managers, which resulted in a shareholder revolt, Purcell's Board rewarded Purcell and Stephen S. Crawford ("Crawford"), his top lieutenant, for their failures with departure pay-offs of over $100 million to secure their silence and cooperation, while attempting to release them from valuable and viable corporate causes of action against them for their prior misdeeds.  The financial community has been scandalized by these events:

> [T]he packages [are] "outsized and undeserved . . . ." "***We think the problem is with the Board***."

Rich Ferlauto, Head of Pension and Benefit Policy at American Federation of State, County and

Municipal Employees.

> [S]uch rich severance deals are . . . "***pay for failure***."

Patrick S. McGurn, Special Counsel, Institutional Shareholder Services.

> "To all external appearances, the majority of Morgan Stanley's Board of Directors have now become complicit in an abdication of governance in a deference to a strong-willed CEO . . . ."

Scott Sipprelle, Former Morgan Stanley Managing Director.

> "***The Morgan Stanley Board of Directors continues to give capitalism a bad name*** . . . ."

Neil Barsky, Hedge Fund Manager.

> "***You have to scratch your head and ask, what was the board doing***?"

Alan Johnson, Compensation Expert.

> Purcell, who presided over a period of underperformance and organizational instability, was awarded a huge severance package by the same board that originally supported him.  As to the board's independence, can one imagine a manager giving a multiyear exit package to a worker who was discharged for cause?

David Rocker, "A Costly Illusion: "Independent" corporate directors often are beholden to the

CEO," *Barron's*, July 18, 2005.

> 3.      This sorry scenario has received very negative commentary:

> Morgan Stanley's board finally realized that the firm wasn't making enough money for its shareholders, so it decided to throw money at the problem – shareholder money.  The recipients?  ***The people who weren't making enough money for the shareholders in the first place***.

> The furor over the golden parachutes for ex-CEO and autocrat Phil Purcell and his hand-picked co-president Steve Crawford ... should give shareholders pause. ...

> This is only the latest in the Morgan Stanley board's multiple missteps.  The Corporate Library, a governance watchdog in Portland, Maine, gives the board an "effectiveness rating" of "D."  Well, that's progress.  It's up from the previous "F" rating.

> *"The Morgan Stanley board of directors continues to give capitalism a bad name," says Neil Barsky, a former Morgan Stanley analyst and now a hedge-fund manager....*

> *...In the years after the original merger between Dean Witter and Morgan Stanley, Mr. Purcell packed the board with long-standing loyalists from his Dean Witter days.*

> *This crony board looked the other way as Mr. Purcell consolidated his power over the past several years, even as the stock and some financial measures lagged behind peers....*

> The board sat by over the years as Mr. Purcell moved his people into most of the major management roles at the company and sidelined Morgan Stanley folks.

> Hedge-fund manager, Scott Sipprelle, a former Morgan Stanley executive, wrote a letter to the board about his concerns last December. The "Gang of Eight" ex-Morgan Stanley top executives got involved in March. *Yet the board continued to stand by Mr. Purcell, even as rainmakers from the Morgan Stanley side headed toward the exits.*

*      *      *

> [T]he Purcell package ... was the board's handiwork. It is estimated at around $106 million, including a new $44 million cash bonus and retirement pay as well as some previously granted stock and options....

> Mr. Crawford was put into his job, by Mr. Purcell, 3-1/2 months ago after years in essentially administrative jobs. *For this he deserves a golden parachute of $32 million in cash compensation? The board guaranteed him $16 million a year for two years – but said he could just walk away with the whole shebang if he left by Aug. 9. Decisions, decisions.*

Jesse Eisinger, "Long & Short: At Morgan Stanley, It's Nice Work If You Can Get the Money When You Leave," *Wall St. J.*, July 13, 2005.

4.       Plaintiff brings this stockholders' derivative action on behalf of and for the benefit of nominal defendant Morgan Stanley. The individual defendants in this action are former and current officers of Morgan Stanley and members of Morgan Stanley's Board of Directors who acted intentionally or recklessly and in bad faith in breaching their fiduciary duties and abusing their control positions, thus permitting the grotesque mismanagement and waste of the corporate assets of Morgan Stanley over the past years, while securing their re-election to Morgan Stanley's Board via a

false 2005 proxy statement.  Then, in an attempt to cover up and/or prevent themselves being held accountable for their prior misdeeds, they authorized, ratified and/or paid (or accepted the payment of) $100 million in cash and stock to two senior Morgan Stanley executives – Purcell ($77.4 million) and Crawford ($32 million) – to get them to leave the Company, while buying them off to secure their silence and cooperation while improperly and in bad faith releasing them from valid, viable and valuable corporate causes of action without adequate care or consideration.  These payments were made and releases were given without the Board obtaining any independent advice of compensation or legal experts as to the propriety of these payments, their appropriateness under the circumstances or the value or validity of Morgan Stanley's legal claims against Purcell or Crawford.  Thus, these payments were not the result of the exercise of informed independent business judgment, but rather, the acts of self-interested individuals acting to protect and entrench themselves at the expense of Morgan Stanley.

5.    Over the past several years, members of the Morgan Stanley Board – defendants Brennan, Davies, Purcell, Jacob, Kidder, Knight, Mack, Madigan, Marsh, Miles, Tyson and Zumwinkel (the "Director Defendants") – breached their fiduciary obligations of due care, loyalty and diligence in exercising their control over the management and administration of the affairs of the Company, as well as the use and preservation of its property and assets.  The Director Defendants were required to act in furtherance of the best interests of the Company and its shareholders and not in the furtherance of their personal interests or benefit or those of Purcell and those Morgan Stanley executives who were loyal to him.  Purcell's tenure as CEO/Chairman of Morgan Stanley (1997-July 2005) resulted in the loss of an enormous number of Morgan Stanley's top executives and operatives – its most talented and productive professionals ("brain drain") – erosion of Morgan Stanley's competitive and market position and several adverse litigation outcomes, including one of the largest

verdicts in investment banking history based on fraud, conspiracy and misrepresentation.   As Morgan Stanley's financial performance lagged badly under Purcell's domination, its stock fell from $109 in 2000 to as low as $47.66 per share in 2005 and still trades at less than half its all-time high – a massive loss of market capitalization.

6.      Thus, the Director Defendants failed to fulfill their obligation to properly discharge their control positions and manage Morgan Stanley with diligence and safeguard and prevent the waste of Morgan Stanley's assets.  Even after Purcell had so badly damaged Morgan Stanley that the public's and shareholders' outcry for his ouster had become irresistible and he had to be put out, instead of firing Purcell for cause or using their control and fiduciary positions to negotiate his resignation on terms favorable to Morgan Stanley, the Director Defendants chose to reward their friend and benefactor Purcell and his loyal supporter Crawford for their failures with huge exit payments so they could buy their silence and cooperation to try to protect themselves.  Since Morgan Stanley's Board is disabled from acting to protect Morgan Stanley, plaintiff brings this action on behalf of Morgan Stanley to, *inter alia*, recover damages for the harm defendants have inflicted on Morgan Stanley, to enjoin the fulfillment and enforceability of the Purcell and Crawford exit agreements, to void "secrecy" or "no ill will" provisions in departure contracts with other executives and/or recover the amount of any payments to them, prevent the Director Defendants from continuing their wasteful, reckless and wrongful course of conduct, and reform Morgan Stanley's corporate governance to protect it and its shareholders from executive and director misconduct in the future.

7.      This action challenges the exit payments to Purcell, Crawford and other departed executives as waste because the Director Defendants failed to use their fiduciary positions and power to obtain a proper outcome for Morgan Stanley.  Based on Purcell's record of misconduct and

- 5 -

mismanagement, if Purcell had been terminated for cause, he would not be entitled to $34.7 million in restricted stock and the one-time departure bonus of $42.7 million, plus other benefits.[1] Moreover, if the Director Defendants had properly dealt with defendant Crawford, who was only promoted to co-president a few months ago and put on Morgan Stanley's Board of Directors solely because of his loyalty to Purcell, they would not have given him, on June 30, 2005, a $32 million incentive in a new contract to quickly resign, which he promptly did, pocketing the huge payment. If Crawford *had simply stayed on in his job*, he would have received little more than $10 million in 2005. Similarly, millions more were paid to other departed executives for the improper purpose of purchasing their silence.

8. The Director Defendants also ignored warning signs, *i.e.*, red flags, year after year, that the Company's legal department and its outside counsel were out of control due to Morgan Stanley general counsel Donald Kempf's and his hand-picked outside firm Kirkland & Ellis's (of which he used to be a partner) consistent pursuit of improper, unethical and even illegal tactics in litigations to enhance their own positions and fees, but which caused great risk and ultimately great damage to Morgan Stanley – the client. This Complaint thus seeks to remedy damages due to Purcell's extremely poor performance, which occurred because the Director Defendants, despite Purcell's missteps and the disastrous consequences of his misperformance, ceded all responsibility for corporate affairs to Purcell, a CEO exercising imperial power, who abused his position as CEO and Chairman for his own enrichment while the Morgan Stanley Board, passively enjoying their own positions of power, prestige and profit, simply looked on, doing nothing to protect Morgan Stanley's interests.

---

[1]     The total value of the package provided to defendant Purcell exceeded $113 million.

9.      The origin of this action goes back to the 1997 merger of Dean Witter and Morgan Stanley to form a financial services firm in securities, investment management and credit services in 28 countries.   After the merger, Morgan Stanley's business included the following segments: **Securities**: Investment Banking, Institutional Sales & Trading, Equity and Fixed Income Research; **Investment Management**: Traditional Investments, Alternative Investments, Retirement Services, Financial Planning and Trust and Estate Advice, Investor Advisory Services; **Credit Services**: Discovery Credit Card, Mortgage Lending, Life and Credit Insurance.  Due to early enthusiasm over the merger and Purcell's assurances it was succeeding, by 2000, Morgan Stanley's stock hit $109 per share.   However, as the dot.com bubble burst and Morgan Stanley suffered repeated business reversals, it lagged behind its peers, such as Goldman Sachs and Merrill Lynch, lost prestige, competitive position and market share and its stock price plummeted.  However, because of an extremely unusual charter provision, insisted upon by Purcell at the time of the merger and acquiesced to by the new Board, it took a 75% Board vote to oust him as CEO.  Thus he was in a position to dominate and control Morgan Stanley's Board, business and officers regardless of his incompetence and acts of mismanagement and self-aggrandizement.

10.      The failure of the Dean Witter/Morgan Stanley merger was detailed by *Fortune* magazine:

> One of the promises of the merger was that the new firm could sell mutual funds and stock offerings, mostly from the old Morgan Stanley side, to retail-brokerage customers, mostly on the Dean Witter side.... The best way to encourage a broker to sell a specific mutual fund is to compensate him for selling it.  ***That, however, is illegal, since it violates the fiduciary duty of the broker to put the financial interest of the client first in any transaction.... [T]he preferential selling of in-house funds by brokers is now being actively prosecuted***.

Another promise was that Dean Witter's supposedly more predictable retail business could stabilize Morgan Stanley's volatile earnings during market cycles.  It has not worked out that way.  According to analyst Richard Bove of Punk Ziegel & Co., from 2000 to 2004, Morgan Stanley's revenues fell 9% while its peer group posted a gain, and its net income fell 18% vs. gains at Goldman Sachs, Bear Stearns, Lehman Brothers, and Merrill Lynch.  ***Thought about another way, in 2000, Morgan Stanley, which posted net income of $5.5 billion, dwarfed rival Goldman Sachs, which had net income of $3.1 billion.  In 2004, Goldman earned slightly more than Morgan Stanley***.

You can see why when you dig into the details.  The best thing Purcell's team can say about the individual-investor business is that it's No.3 behind Merrill and Citi.  ***Over the past five years total client assets, revenues, and pretax profits have all declined.  Morgan Stanley's brokers are far less productive than their peers .... [T]he average revenue per broker at Morgan was $431,000 in 2004, vs. $697,000 at Merrill***.

The asset-management business has also been mediocre....  48% of Morgan Stanley's mutual funds have four- or five-star rankings from Morningstar... [but] ***that ... places Morgan at the bottom third of its peer group*** ....  [I]nflows into Morgan's funds have lagged the industry for five of the past six years; revenues and pretax profits have also declined by an average of 1.2% and 7.1% per year, respectively, over the past five years....

The bulk of the firm's business, accounting for over 60% of pretax profits, is institutional securities – that is, the investment-banking and trading businesses that were the old Morgan Stanley.  Here Morgan Stanley still has a strong market share in many businesses, but some see signs of deterioration.  ***Take mergers and acquisitions, the heart of an investment-banking franchise.  Back in 1997, Goldman's revenues from M&A were 30% higher than Morgan Stanley's.  Today they are 50% higher.  And morale is not good.  "There was a greater sense that we were losing ground than the numbers would show," says a former Morgan Stanley banker***.

Bethany McLean and Andy Serwer, "Brahmins At The Gate," *Fortune*, May 2, 2005.



11.     Morgan Stanley's stock price recovery after the bear market following the dot.com bust also did not keep up with its peers.  After dropping 64% during the downturn, Morgan Stanley's stock price recovered 69% as compared to Goldman Sachs' which dropped 45% but rebounded 102% and Merrill Lynch's which dropped 59% and rebounded 90%.  All in all, during 2004, Morgan Stanley's stock price actually declined 8%.  This miserable stock performance is reflective of the mismanagement of Morgan Stanley's business by Morgan Stanley's executives and directors.

12.     The portion of the merged business Purcell managed – the brokerage and Discover credit card businesses – especially underperformed during his tenure.  In 2004, the brokerage business only comprised 6% and Discover 19% of the Company's profits.  In fact, these percentages for these two business segments were the same in 2004 as they were before the merger.  At the end of defendant Purcell's tenure, not only are these business segments not poised for future growth, but there has been widespread speculation Morgan Stanley will sell these business lines.  Morgan Stanley's brokers' performance appears to have lagged far behind competing firms and the

- 9 -

brokerage business has experienced no revenue growth.  Morgan Stanley's average revenue per broker was actually down 2% to $420,000 in 2004 from $427,000 before the merger.  This compares with Merrill Lynch's brokers who achieved average revenue of $695,000 in 2004, up 24% from $562,000 before 1996.  While the merger was a failure, Purcell and his hand-picked Board refused to acknowledge this or properly deal with this situation.  Instead, they simply entrenched themselves in their positions of power, prestige and profit, aggrandizing their own interests and positions at the expense of Morgan Stanley and its shareholder community – to the damage of Morgan Stanley.  In truth, Purcell has dominated and controlled the Morgan Stanley Board for years due to a network of social and business connections and because he had hand-picked most of the Board members.



13.     Despite these problems and even though Morgan Stanley shareholders witnessed a decline in market capitalization during 2004, Purcell and the Board of Directors gave themselves huge raises.  As reflected in Morgan Stanley's 2005 Proxy, ***Purcell's total compensation was increased 57% from $14 to $22 million from 2003 to 2004.  At the same time in early 2005, the Director Defendants' payments for serving on the Board were more than tripled to approximately $300,000***!

14.     In December 2004, Purcell's mismanagement of Morgan Stanley came under open public attack, due to complaints by important shareholders and former executives.  Purcell quickly used his domination of and power over Morgan Stanley to take whatever steps were necessary to protect his position of power, prestige and profit and those of his allies on the Board and within Morgan Stanley's management ranks.  Purcell implemented ill-advised measures to secure his position, which had no legitimate business purpose and harmed Morgan Stanley.  As a result, Morgan Stanley quickly experienced a mass exodus of many of its most senior and talented investment bankers.  This mass exodus and/or "brain drain" – unprecedented in the history of investment banking on Wall Street – continued unabated through the time of Purcell's own ultimate departure from Morgan Stanley in mid-2005.

15.     When the first signs of shareholder dissatisfaction surfaced in December 2004 after the Board received a letter from Scott Sipprelle, a Morgan Stanley shareholder and former managing director at the Company, Purcell acted to entrench himself in his position by reappointing his former mentor, boss and fellow Dean Witter director, Edward A. Brennan, to Morgan Stanley's Board, even though Brennan had just retired in October 2003 and, at 71, ***was beyond the mandatory retirement age of 70 for Morgan Stanley directors***.  Thereafter, when a group of former Morgan Stanley executives, known as the Group of 8, publicly challenged Purcell's leadership in March 2005,

Purcell escalated his entrenchment strategy, which served no legitimate business purpose but which was designed to further entrench his and his allies' positions at the firm.

16.     In response to the demands of the Group of 8, rather than meet with them or seriously evaluate their concerns, defendant Purcell instead required the two most senior investment bankers at Morgan Stanley to swear personal loyalty to him.  When they refused, he forced them out and replaced them with less qualified investment bankers, including Zoe Cruz and Crawford, whose main attribute was their loyalty to Purcell purchased by him with corporate funds.  In addition to promoting these persons loyal to him over more senior and more qualified investment bankers, defendant Purcell used his control and domination of Morgan Stanley to put them on the Board.  In response to the challenges to his leadership, Purcell added three directors to the Board loyal to him without obtaining shareholder approval, because he knew obtaining approval would be unlikely given that the appointment of these directors served only to secure his power and position as CEO. Morgan Stanley's directors acquiesced in this self-aggrandizement.

17.     Although Purcell's management machinations had the desired effect of further entrenching Purcell, at least temporarily, in his position, they sparked a massive and devastating "brain drain."   In total, and in just over two months, ***Morgan Stanley lost over 50 senior professionals, most of whom worked for the most profitable business segment, investment banking – people unwilling to work in the environment of incompetence and favoritism overseen by Purcell***.  Many of these departures were accompanied by huge multi-million dollar payments to departing executives to secure their silence and/or non-criticism of Purcell and his management team, an expenditure of corporate funds for improper purposes and a waste of corporate assets.  To keep departing management committee members silent, Purcell made Morgan Stanley pay some of them over $6.5 million each for "good behavior," *i.e.*, silence and cooperation, and accelerated

vesting of their equity holdings.  Ultimately, to prevent even more departures, Morgan Stanley was

forced to spend hundreds of millions of dollars to retain investment bankers.

18.     This "brain drain" was like nothing ever seen on Wall Street and has very badly

damaged Morgan Stanley's competitive position.  Among the executives that Purcell forced out or

who left because they would not tolerate the hostile work environment fostered by the Purcell "cult,"

were:

- Stephan Newhouse – President

- Joe Perella – Vice Chairman

- Vikram Pandit – President, Institutional Securities

- John Havens – Head of Institutional Equity

- Tarek Abdel-Meguid – Head of Investment Banking

- William Kourakos – Head of High-Yield Bonds

- Raymond McGuire – Co-Head of Global Merger/Acquisitions

- Robert Karofsky – Head of Equity Trading

19.     *Bloomberg* detailed the improper payments made to some of these executives to

secure their silence:

> Morgan Stanley disclosed last week that Joseph Perella and Terry Meguid,
> two among the herd of bankers who have fled the rule of Philip Purcell, are still
> owed $6.4 million each.  But there's a catch:  For the rest of the year, they cannot
> support or associate with the shareholders seeking to ***oust Purcell, join a team of
> managers that might replace him, or take jobs with other firms.  They cannot speak
> ill of their former employer for three years***.
>
> This is interesting, for at least two reasons.  The first is that Morgan Stanley's
> directors see nothing bizarre in the arrangement.  The directors, of course, are meant
> to represent the interests of Morgan Stanley shareholders.  But if they were serious
> about taking on this unpleasant chore, they might ask:  ***How is it in the interest of
> shareholders to pay millions to top executives to prevent them from explaining why
> they quit***?

*     *     *

- 13 -

I suppose there might be some shareholders who prefer not to know what's going on inside their firm – shareholders who prefer not to consider the possibility that there's anything wrong with the way Morgan Stanley has been run for the past few years.  There may also be shareholders who believe that it doesn't matter how badly Morgan Stanley is being run, *so long as potential buyers of their shares don't hear about it*.

There may even be shareholders who take perverse pleasure in paying their chief executive officer $20 million or so a year without demanding anything in return, just as there are moviegoers who, when they see "Deliverance," think how much fun it would be to be asked to squeal like a pig.  After all, once you acknowledge the existence of masochism, you have to also consider that it might express itself financially.

But less perverse shareholders – those characters from finance textbooks who enjoy seeing their company run well, and their shares rising in value – would almost certainly disagree.  And these shareholders now find themselves paying $12.8 million, in effect, to prevent the people who know the most about Phil Purcell's ineptitude from telling them about the man.  They are paying $12.8 million, also, to delay a competent alternative management team from being assembled.

\*       \*       \*

At any rate, we can now see that, contrary to popular opinion, the chief executive of Morgan Stanley has a business strategy:  to minimize the *flow of information from the inside to the outside of Morgan Stanley*.

Sometimes – as in the mysterious disappearance of the firm's e-mails from the Internet craze – silence has worked out nicely.  Other times – as when the firm's failure to provide e-mails and other documents to a Florida court in defending a lawsuit by Ronald Perelman angered the judge – it has cost the firm many hundreds of millions of dollars.  But all along the wall of silence has served one end very well:  preserving Phil Purcell's job.

Michael Lewis, "How Much Is Joe Perella's Silence Worth?" *Bloomberg*, May 27, 2005.

20.     All of the costs to retain professionals and secure the silence of those who departed –

millions of dollars in the aggregate – would have been avoided had Purcell not pursued his cult of

personal loyalty and done away with the firms' meritocracy.  By ceding complete power over

corporate affairs to Purcell, the Board allowed this massive waste of corporate assets to further

entrench Purcell and themselves, while damaging Morgan Stanley.

21.     In addition to rewarding Purcell for the damages and waste which occurred as a result of the mismanagement of Morgan Stanley during his reign, including the "brain drain," the Director Defendants tolerated, and even rewarded, Purcell for the disastrous consequences of Morgan Stanley's out-of-control legal department headed by Purcell's long-time friend, Donald Kempf ("Kempf"), who used his former firm, Kirkland & Ellis, to represent Morgan Stanley.  Purcell hand-picked Kempf as Morgan Stanley's general counsel because he knew Kempf would put Purcell's interests ahead of Morgan Stanley's and not act independently of Purcell.  The May 2005 $1.5 billion verdict against Morgan Stanley in a suit brought by Ronald Perelman for fraud in connection with Morgan Stanley representing Sunbeam in its acquisition of Perelman's 82% interest in Coleman for Sunbeam stock, was the direct result of Purcell's, Kempf's and Kirkland & Ellis's repeated unethical acts and malpractice.  The Morgan Stanley Board gave Purcell unsupervised discretion over the Morgan Stanley legal department without oversight by the Director Defendants who failed to ensure the Company had adequate internal controls to comply with federal and state laws, including laws which require the Company to preserve e-mail and other evidence when it was relevant to pending litigation.  The Director Defendants' reckless disregard of the disastrous consequences of an out-of-control legal department and outside legal counsel, despite their repeated failures to comply with legal and ethical requirements, resulted in great damage to Morgan Stanley.

22.     Morgan Stanley's "problem" with preserving or producing documents in litigation was not an isolated instance confined to the Coleman/Sunbeam litigation –  Morgan Stanley has repeatedly gotten into trouble over how it preserves and turns over documents in litigation:

- November 2002:  Was one of five firms that together paid regulators $8.9 million for violating rules about retaining e-mail.

- July 13, 2004:  Averted a sex-discrimination trial by agreeing to pay $54 million to settle claims; case featured a dispute about e-mail.

- July 21, 2004:  Was fined $250,000 for failing to hand over documents in investor-complaint cases.

- July 30, 2004:  Agreed to pay $2.2 million to regulators to resolve allegations it delayed disclosing 1,800 customer complaints involving stockbrokers.

- March 2005:  Was chastised by a Florida state judge for "bad faith" toward its discovery obligations in the suit by financier Ronald Perelman.

This kind of track record can only result from a conscious policy of non-compliance and concealment.

23.    Defendant Purcell's and his hand-picked general counsel Kempf's tenures at Morgan Stanley were marred by repeated and escalating run-ins with regulators caused by their litigation strategies and flagrant flaunting of federal and state requirements to preserve evidence, including e-mail.  In fact, one of Purcell's defining characteristics was the lengths to which he went to keep things secret.  In 2002, Morgan Stanley was fined over $10 million by New York Attorney General Elliot Spitzer for failing to comply with e-mail retention requirements during Spitzer's probe into Wall Street's research practices.

24.    Thus Purcell and Kempf were emboldened to continue to hide or destroy evidence, rather than preserve and/or produce documents, even when required to do so under federal law or pursuant to a court order.  Time and time again, no matter what fines were levied against them, Purcell and his general counsel stuck to these illegal and unethical tactics.  In January 2005, Morgan Stanley received a "Wells Notice" from the SEC Division of Enforcement recommending that the SEC pursue an enforcement action relating to the Company's retention of e-mails and the potential violation of a 2002 cease and desist order.  In 2002, Morgan Stanley paid an $8.25 million fine and agreed to cease and desist for failing to comply with SEC requirements that investment banks keep e-mail for three years.  Purcell concealed and did not disclose the Wells Notice until April 7, 2005, *after* the Company's March 15, 2005 Annual Meeting of Shareholders and after he had commenced

his management purge to entrench himself.  On May 3, 2005, Morgan Stanley disclosed, as part of its response in another lawsuit, that it had found e-mails that it had previously said were destroyed during the terrorist attacks on September 11, 2001.  These would have been examined as part of the broad inquiry by regulators into allegations of fraudulent research by Wall Street firms.  Despite underwriting many of the Internet share offerings that later turned sour, Morgan Stanley avoided the harsher penalties imposed on its rivals because no incriminating e-mails were found during the case – a fact Purcell has gloated about.  *Finding these e-mails now is serious and if they contain material that is incriminating, Morgan Stanley will be fined*.

25.     The Morgan Stanley hide-and-delay strategy became a lethal combination in the context of the Coleman/Sunbeam litigation, where Perelman sued Morgan Stanley for fraud and negligence in helping Sunbeam falsify its financial statements and the condition of its business.  The facts of the case strongly suggested Morgan Stanley's culpability.  Arthur Andersen had provided a letter to Morgan Stanley expressing concern that Sunbeam was only at $73 million in revenue by mid-March 1998.  Nevertheless, Morgan Stanley helped Sunbeam draft a release assuring investors that Sunbeam would achieve $253 million in revenues for Q1 1998 *with only 14 days left in the quarter*.  Almost immediately after the transaction closed, Sunbeam announced Q1 1998 would be a disaster, resulting in the company's stock falling, causing a huge loss to Perelman.  Within months, Sunbeam would collapse and go bankrupt in a massive accounting fraud.  Morgan Stanley had a lot to lose if the Coleman transaction did not close, as Morgan Stanley had loaned Sunbeam $650 million, which stood a better chance of being paid if the Coleman acquisition closed.  In addition, Morgan Stanley was the underwriter on a $750 million bond offering used to finance the cash part of the Coleman acquisition and earned over $30 million in fees.

26.     Despite these inculpatory facts, Purcell and the Morgan Stanley Board refused Perelman's offer to settle for $20 million in 2003.  When asked about the strength of the case, general counsel Kempf and Kirkland & Ellis, Morgan Stanley's counsel in the Coleman/Sunbeam litigation and Kempf's old law firm, stated that Perelman's case was weak when they knew or should have known it was very strong.  Morgan Stanley refused to settle and instead allowed its lawyers to pursue its routine method to foil its litigation adversaries:  delaying, lying and hiding relevant evidence.  Opposing counsel in the Coleman/Sunbeam case described the Company's behavior over several years: "***Morgan Stanley hid evidence,  Morgan Stanley destroyed evidence, Morgan Stanley filed false certifications.  Morgan Stanley lied to the court [presiding over the trial] and sought in every way possible to cover up its wrongdoing***."  Based on years of egregious litigation conduct, the trial judge entered an order that it would instruct the jury that Morgan Stanley participated in the fraud in response to the Company's conduct in misleading opposing counsel and the court and in hiding evidence.  Due to Morgan Stanley's misbehavior and refusal to produce e-mails in contravention of court orders, the only logical conclusion the court could reach in the Coleman/Sunbeam litigation was that Morgan Stanley was an active participant in the fraud.  As a result, the presiding court concluded that Morgan Stanley actively furthered the fraud.  The court ruled that Morgan Stanley's "***failings were done knowingly, deliberately and in bad faith***," and "[***a***] ***reasonable juror could conclude that evidence of Morgan Stanley & Co's misconduct demonstrates its consciousness of guilt***."

27.     If the Morgan Stanley Board properly ensured that the Company had internal controls to comply with the law and was in fact complying with the law, then the legal department and outside counsel would not have been so emboldened to hide documents, delay discovery and mislead the opposing party and the court.  If the Board had properly exercised its fiduciary duties, Purcell,

Kempf and Kirkland & Ellis would have known that their improper litigation tactics would not be tolerated and further that they ultimately would be required to produce critical evidence.  By not engaging in discovery abuses, Morgan Stanley would have avoided the jury hearing twice the court's instructions to assume Morgan Stanley participated in the fraud:  once at the compensatory damages phase and a second time at the punitive damages phase, which resulted in a $1.5 billion verdict.

28.     As a result of the on-going public outcry over Morgan Stanley's "brain drain," the erosion to its competitive position, the $1.5 billion verdict in Florida and Morgan Stanley's declining financial results – despite all his actions to entrench himself – Purcell had to go.  On June 13, 2005, Purcell announced he would resign.  On June 30, 2005, Morgan Stanley announced that John J. Mack ("Mack") had replaced Purcell as Chairman and CEO, that Crawford would also resign and that Purcell and Crawford were to be paid over $100 million.

29.     The Director Defendants permitted Purcell to get $34.7 million in restricted stock, which would have been forfeited had he been terminated for cause, and gave him a $42.7 million one-time cash departure bonus he was not entitled to.  The Director Defendants also rewarded Crawford by giving him $32 million to resign.  Mack acquiesced in and agreed to these payments because he wanted Purcell and Crawford out so that he could get the CEO position at Morgan Stanley for himself, as that position would be worth millions of dollars a year to him.  Unfortunately, it is Morgan Stanley and its shareholders who must suffer the excessive payments to reward Purcell and Crawford for their acts of mismanagement and abuse of control and sustain billions of dollars of damage through losing top-notch talent and the Coleman/Sunbeam litigation disaster and other losses, while watching as the Director Defendants improperly and in bad faith release defendants Purcell and Crawford from valid, viable and valuable legal claims, to buy their silence and cooperation, thus helping to preserve the directors in their positions of power, prestige and profit.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C.

§1331, as plaintiff's claims arise in part out of the laws of the United States; §27 of the Securities

Exchange Act of 1934 ("Exchange Act"), as to the derivative claims for violations of §10(b) of the

Exchange Act and the SEC Rule 10b-5 promulgated thereunder and §14(a) of the Exchange Act and

SEC Rule 14a-9 promulgated thereunder; 28 U.S.C. §1367 (supplemental jurisdiction); and under

principles of ancillary jurisdiction.

31.     Venue is proper in this District because Morgan Stanley has its principle place of

business in this District.  Plaintiff's claims arose in this District and Morgan Stanley has suffered and

will continue to suffer harm in this District, where most of the actionable conduct took place, where

most of the documents and electronically stored evidence exist, and where virtually all the witnesses

are located and available to testify live at the jury trial permitted on these claims in this Court.

Moreover, each defendant, as a Company officer or a member of Morgan Stanley's Board of

Directors, has extensive contacts with New York.

## THE PARTIES

32.     Plaintiff Central Laborers' Pension Fund is, and was at all times relevant hereto, an

owner and holder of Morgan Stanley common stock.

33.     Nominal Defendant Morgan Stanley is a corporation organized and existing under the

laws of the State of Delaware with its headquarters located at 1585 Broadway, New York, New York

10036.  Morgan Stanley is a full-scale financial services company which offers investment banking,

institutional sales, trading and research of equities and bonds, individual investor services,

investment management services and credit services, including the Discover credit card.

34.     When Dean Witter merged with Morgan Stanley in 1997 the two sides agreed the 14-

member board would be evenly split between Dean Witter and Morgan Stanley designees.  Purcell,

who became chairman and CEO of the combined company, tapped his former boss, Brennan, as a board member.  In addition, he brought on a Dean Witter executive, Thomas Schneider, and five former Dean Witter directors.  All but one of that five-director contingent (who has since retired from the board) hailed from Chicago or the broader Midwest.

35.    Next, Purcell also made a shrewd and crucial move.  He installed one of his own allies as chair of the committee that nominates new directors: Michael A. Miles ("Miles"), former CEO of Philip Morris Cos. and one of the five former Dean Witter directors.  From then on, Purcell kept a strong grip on the nomination of new directors by personally funneling names to Miles.  From the beginning, Purcell both cultivated and controlled access to the merged board, telling Morgan Stanley bankers to seek his permission before contacting directors.

36.    Initially, the Board kept up a 50/50 split between the two camps.  When Fisher resigned from the board in the late 1990s, a Dean Witter designee, Schneider, stepped down, too.  But with several of the next openings, Purcell and Miles continued to hand-pick new directors.

37.    In 2000, Morgan Stanley's Board representation fell off significantly.  Morgan Stanley designee Diana D. Brooks, former CEO of Sotheby's Holdings Inc., the art auction house, resigned in February 2000.  That same year, two other Morgan Stanley directors left when their terms expired because they had reached the Board's retirement age.  Mack left in early 2001 after being denied the CEO title he sought.  Scott, a former Morgan Stanley investment banking chief, took over the presidency and his Board seat.  But the Board, then 10 members, had just three Morgan Stanley directors left by then.  After Purcell pushed out Scott, he gave the president's job to Stephan Newhouse, former co-chief of the securities division.  But Newhouse worked from London and had no operating responsibilities for the various divisions.

38.     Defendant Philip J. Purcell ("Purcell") was Chairman of the Board of Directors, Chief Executive Officer and a director of Morgan Stanley from May 1997, when the Company merged with Dean Witter, until he resigned from those positions on June 30, 2005.  As a result of his positions and his various relationships with members of Morgan Stanley's Board, defendant Purcell has conflicts with other members of Morgan Stanley's Board.  Further:

(a)     From the time in 1997 when Morgan Stanley merged with Dean Witter until his resignation, Purcell manipulated the nomination and election of Morgan Stanley's Board. Immediately following the merger, the Board was comprised equally of directors from the old Morgan Stanley and Dean Witter companies.  Defendant Purcell, however, controlled the Board's nominating committee by putting former Dean Witter directors, defendants Miles and Miles L. Marsh ("Marsh"), on that committee and thus controlled the nominations for election to the Board by feeding his nominations to the Board directly to defendant Miles.  At present, only one director remains from the pre-merger Morgan Stanley.

(b)     Defendant Purcell and members of the Board have prior business relationships, outside Morgan Stanley, and on-going social relationships which prevent Board members from acting independently of Purcell or taking positions contrary to him:

(i)     **Dean Witter:**  Four other former Dean Witter directors sit on the Morgan Stanley Board: defendants Edward A. Brennan ("Brennan"), C. Robert Kidder ("Kidder"), Marsh and Miles.

(ii)     **Sears Roebuck:**  Defendant Brennan is the former Chairman, President and Chief Executive Officer of Sears who asked defendant Miles to join the Sears Board in 1992.  While at Sears, defendant Brennan was a mentor to defendant Purcell who reported to him. Defendant Purcell started the Discovery credit card under defendant Brennan at Sears and spun it off

with Dean Witter in 1993.  Additionally, defendant Miles was formerly Chairman of the Board at Sears.

        (iii)      **Kraft Foods:**  While chairman of the nominating committee, defendant Miles recruited and nominated two directors who formerly worked under him at Kraft Foods.  These directors include defendants Marsh and Kidder.  Defendant Brennan also served on the Kraft Foods Board.

        (iv)      **McKinsey & Co.:**  Four directors were also partners at the international consulting firm McKinsey & Co. where defendant Purcell was also a partner.  These directors include defendants Sir Howard J. Davies ("Davies"), Kidder, Marsh, and Klaus Zumwinkel ("Zumwinkel").

        (v)      **Other Boards:**  A number of the defendants also served together on other boards, which further restricts directors from taking contrary positions:  **AMR Corp.:** defendants Purcell, Miles and Brennan serve on the AMR Corp. Board together.  **SBC Corp.:**  defendant Charles F. Knight ("Knight") serves on five boards including SBC Corp. with defendant Laura D'Andrea Tyson ("Tyson") who also serves on that Board.  **Anheuser-Busch:** defendants Knight and John E. Jacob ("Jacob") serve together on this Board.

        (vi)      **Other CEOs:** In addition to defendant Purcell, defendants Knight, Marsh, Kidder, Brennan, and John W. Madigan ("Madigan") were all CEOs.

        (vii)      **Chicago and the Midwest Connections:**  Defendant Purcell still maintains his residence in the Chicago area and commuted to New York while at Morgan Stanley. Incredibly, none of the other directors, except defendant Mack, who was added to the Board on June 30, 2005, reside in New York.  In fact, most reside in Chicago or the Midwest.  Along with

defendant Purcell, defendants Brennan, Madigan, Marsh and Miles reside in the Chicago area. Defendants Jacob and Knight reside in St. Louis and defendant Kidder resides in New Albany, Ohio.

(viii)   **Augusta National Golf Club:** Defendant Purcell, who regularly used the Morgan Stanley jet to travel to play golf at Augusta, also serves with other directors who are members of Augusta.  These include defendants Knight and Brennan.

(c)   Defendant Purcell used Morgan Stanley's jet to incur expenses of $467,142 in personal use in 2004.  This amount represents only a fraction of the actual cost incurred by Morgan Stanley in allowing defendant Purcell to use the Company jet for golf outings at Augusta or even to commute from Chicago, which defendant Purcell did every week.  Further, defendant Purcell allowed members of the Board to have personal use of the corporate jet.  In fact, on March 2, 2003, *The New York Times* reported on the Board's personal use of the jet and defendant Purcell's comment, "The most important thing I have to do is to keep *my* Board happy."

(d)   Defendant Purcell, through his control and domination of the Board took improper steps without shareholder approval to insulate him from challenges to his position by shareholders and Morgan Stanley senior executives.

(e)   Defendant Purcell, as Morgan Stanley's CEO and Chairman, in 2004 received total compensation of $22 million, a 57% increase from the $14 million he received in 2003 even though Morgan Stanley's stock was down 4% during the same period.  Purcell also received total compensation of $11 million, $15 million, $22 million, $21 million, $13.3 million and $14.4 million in 2002, 2001, 2000, 1999, 1998 and 1997, respectively.

(f)   By virtue of his positions with Morgan Stanley, his personal participation in the wrongful conduct alleged in this Complaint (including protecting his own reputation and positions at Morgan Stanley over the interests of the firm) and his extensive personal and

- 24 -

professional relationships with the rest of Morgan Stanley's Board, defendant Purcell is directly interested in the misconduct alleged herein, which indicates that he elevated his own financial and career interests as CEO of Morgan Stanley over his obligation to monitor the functioning of the Company's in-house legal department and to promote senior executives consistent with the Company's prior practice of promoting based on merit, not on loyalty to defendant Purcell. Defendant Purcell directed the misconduct alleged herein to stifle a sweeping challenge against his incompetence and failures and a challenge to his position by shareholders and senior management. Further, defendant Purcell aided and abetted the breach of fiduciary duties by the Director Defendants who agreed to pay him $77.4 million in exit payments to buy his silence and cooperation and to release him from valid and viable legal causes of action.

39.     Defendant Edward A. Brennan ("Brennan"), has been a member of Morgan Stanley's Board of Directors since December 2004 and formerly was a director from 1993 to October 2003. As of December 14, 2004, as detailed in Morgan Stanley's most recent proxy filed with the SEC on February 15, 2005, defendant Brennan receives close to $300,000 in total compensation for being a member of Morgan Stanley's Board and currently owns, beneficially or otherwise, 289,522 shares or options to purchase shares of Morgan Stanley stock.  Further:

(a)     Defendant Brennan was reappointed to the Board of Directors on December 13, 2004, by defendant Purcell after the Morgan Stanley Board received a letter from a former Morgan Stanley Managing Director and current shareholder in which he described the 1997 Morgan Stanley/Dean Witter merger as a failure and stated that the Company should be broken up.  After rejoining the Board in December 2004, defendant Brennan became one of 5 former Dean Witter directors before the merger to sit on the current Morgan Stanley Board.  Along with defendants

Purcell, Kidder, Marsh and Miles, defendant Brennan was on the board of the Dean Witter prior to the merger.

(b)     At the time defendant Brennan was reappointed to the Board, Morgan Stanley's by-laws provided that defendant Purcell could only be removed as CEO with a super majority 75% vote of the Board.  Obviously, with the first signs of a shareholder revolt in December 2004, defendant Purcell scramble to get defendant Brennan reappointed so that his former mentor, boss and fellow Dean Witter director would help him stack the Board with former Dean Witter directors.

(c)     Defendant Brennan has long-standing ties to defendant Purcell and other members of the Morgan Stanley Board.  Defendant Brennan is the former Chairman, President and CEO of Sears Roebuck and Co. from which he retired in 1995.  While at Sears, defendant Brennan was responsible for nurturing defendant Purcell's career there as Sears acquired Dean Witter and then as defendant Purcell started the Discover credit card.  After defendant Purcell spun off Dean Witter and the Discover credit card from Sears in 1993, defendant Brennan joined the Dean Witter Board.

(d)     Defendant Brennan also has long-standing ties to defendant Miles.  He sat on the Kraft Foods Board while defendant Miles was Chairman and CEO of the Company.  Defendant Marsh also spent time on that Board.  Defendants Brennan, Miles and Purcell also sat concurrently on the AMR Corp Board from which he retired in 2004.

(e)     Defendant Brennan also has social ties to other Morgan Stanley directors as he, defendant Purcell and defendant Knight are members of the Augusta National Golf Club.  Further, defendant Brennan and defendant Madigan both have positions at Rush University Medical

Center.  Defendant Brennan is also one of the five Chicago area directors, including defendants Purcell, Madigan, Marsh and Miles.

(f)     Defendant Brennan also sits of the Boards of the 3M Company and The McDonalds Corporation.

40.     Defendant Stephen S. Crawford ("Crawford"), on March 28, 2005, became a co-President with responsibility for Morgan Stanley's Institutional Securities, Individual Investor and Investment Management Groups.  Crawford was a member of Morgan Stanley's Board of Directors from April 4, 2005 to June 30, 2005.  Formerly, Crawford had been an Executive Vice President and the Chief Administrative and Risk Officer since March 2004, an Executive Vice President and Chief Financial Officer from March 2001 to March 2004, an Executive Vice President and the Chief Strategic and Administrative officer from June 2000 to March 2001 and a Managing Director since 1998.  Defendant Crawford was promoted to the position of co-president and director as a result of the management shakeup defendant Purcell engineered in late March 2005 because of his loyalty to Purcell and so that Purcell would secure his position and purge the Company of management he perceived not to be loyal to him.  Defendant Crawford resigned his position on the Board on June 30, 2005 and entered into the new employment contract which guaranteed him either $16 million per year in 2005 and 2006 or $32 million all at once if he resigned for any reason before August 3, 2005.  Defendant Crawford resigned on July 11, 2005 and thus got $32 million.  Crawford aided and abetted the breach of fiduciary duties by the Director Defendants who agreed to pay him $32 million to buy his silence and cooperation and to release him from valid and viable legal claims.

41.     Defendant Sir Howard J. Davies ("Davies"), has been a member of Morgan Stanley's Board of Directors since 2004.  Davies has been the Director for the London School of Economics and Political Science since September 2003.  Davies formerly held the position of the  Chairman and

Chief Executive for the UK Financial Services Authority from August 1997 to September 2003 and Deputy Governor with the Bank of England from September 1995 to August 1997. As of December 14, 2004, as detailed in Morgan Stanley's most recent proxy filed with the SEC on February 15, 2005, defendant Davies will receive close to $300,000 in total compensation for being a member of Morgan Stanley's Board and owned 8,000 shares of Morgan Stanley common stock. Further, Davies was hand picked by defendant Purcell to be on the Board and he owes his position to him. In addition, Davies is one of five Morgan Stanley directors who were partners at the international consulting firm McKinsey & Co. These directors include defendants Kidder, Marsh, Purcell and Zumwinkel.

42. Defendant John E. Jacob ("Jacob") has been a member of Morgan Stanley's Board of Directors since 2001. Jacob has been the Executive Vice President of Global Communications of the Anheuser-Busch Companies, Inc. since 1994. Jacob sits on the Board of Anheuser-Busch with defendant Knight. Jacob formerly held the position of President and CEO of the National Urban League, Inc. from 1982-1994. As of December 14, 2004, as detailed in Morgan Stanley's most recent proxy filed with the SEC on February 15, 2005, defendant Jacob will receive close to $300,000 in total compensation for being a member of Morgan Stanley's Board and owned 41,223 shares of Morgan Stanley common stock.

43. Defendant C. Robert Kidder ("Kidder") has been a member of Morgan Stanley's Board of Directors since 1993. Kidder is currently a Principal of Stonehenge Partners, Inc., a private investment firm since June 2004. Kidder formerly held positions of President of Borden Capital, Inc. from November 2001 to March 2003, and Chairman of the Board from January 1995 to August 2004, and Chief Executive Officer from January 1995 to March 2002 of Borden Chemical, Inc. Kidder also sits of the Board of Electronic Data Systems Corporation. As of December 14, 2004, as

detailed in Morgan Stanley's most recent proxy filed with the SEC on February 15, 2005, defendant Kidder will receive close to $300,000 in total compensation for being a member of Morgan Stanley's Board and owned 130,631 shares of Morgan Stanley common stock.  Further:

(a)     Kidder has long-standing business connections with other members of Morgan Stanley's Board of Directors.  Along with defendant Marsh, Kidder used to work for defendant Miles while they were at Kraft Foods.  Defendant Miles, as head of the Nominating Committee of Morgan Stanley's Board, was responsible for recruiting Kidder to join the Morgan Stanley Board.  Defendant Kidder is also one of five current Morgan Stanley board members who also sat on the Dean Witter board prior to the merger.  Along, with defendants' Brennan, Purcell, Marsh and Miles, Kidder was on Dean Witter's board prior to the merger.

(b)     Kidder is one of five Morgan Stanley directors who were partners at the international consulting firm McKinsey & Co.  These directors include defendants Davies, Marsh, Purcell and Zumwinkel.

44.     Defendant Charles F. Knight ("Knight") has been a member of Morgan Stanley's Board of Directors since 1999.  Knight is currently Chairman Emeritus (since September 2004), and formerly Chairman (1974 to September 2004), and CEO (1973 to October 2000) of Emerson Electric Company.  Knight also sits on the Boards of Anheuser-Busch Companies, Inc., IBM Corporation, SBC Communications, Inc. and BP p.l.c.  As of December 14, 2004, as detailed in Morgan Stanley's most recent proxy filed with the SEC on February 15, 2005, defendant Knight will receive close to $300,000 in total compensation for being a member of Morgan Stanley's Board and owned 72,086 shares of Morgan Stanley common stock.  Knight has business and personal social ties to other Morgan Stanley directors.  He sits on the Board of SBC Communications with defendant Tyson. Knight is also a member of the Augusta National Golf Club with defendants Purcell and Brennan.

45.     Defendant John J. Mack ("Mack") was Morgan Stanley's Chief Operating Officer, President and a director with more than 30 years experience at the Company until he resigned in January 2001, having been purged by Purcell.  Mack plotted his return to power at Morgan Stanley for years.  To secure his return to power, Mack agreed to the payoffs to Purcell and Crawford, as well as the improper release of Morgan Stanley's viable and valid claims against them for no consideration because defendant Mack knew doing this would permit him to obtain the Chairman/CEO positions at Morgan Stanley he had coveted and lusted after for years.  On June 30, 2005, Mack replaced defendant Purcell as Chairman of the Board and CEO.  On July 5, 2005, Morgan Stanley announced that Mack was guaranteed to receive $25 million per year in compensation.  This salary, though ultimately changed by defendant Mack to incentive based compensation, was agreed to at the same time the Director Defendants and Mack agreed to the exit payments to Purcell and Crawford of $109.4 million.

46.     Defendant John W. Madigan ("Madigan") has been a member of Morgan Stanley's Board of Directors since 2000.  Madigan is currently a Special Partner in Madison Dearborn Partners.  Madigan formerly was Chairman (January 1996 to December 2003), Chief Executive Officer (May 1995 to December 2002) and President (May 1994 to July 2001) of the Tribune Company.  As of December 14, 2004, as detailed in Morgan Stanley's most recent proxy filed with the SEC on February 15, 2005, defendant Madigan will receive close to $300,000 in total compensation for being a member of Morgan Stanley's Board and owned 56,382 shares of Morgan Stanley common stock.  Madigan was hand picked by defendant Purcell to sit on the Morgan Stanley Board.  Defendants Madigan and Brennan both have positions at Rush University Medical Center.  Defendant Madigan is also one of the five Chicago area directors, including defendants Brennan, Marsh, Miles and Purcell.

47.     Defendant Miles L. Marsh ("Marsh") has been a member of Morgan Stanley's Board of Directors since 1996.  Marsh formerly was Chairman and CEO of Fort James Corp. (August 1997 to November 2000), and Chairman (January 1996 to August 1997) and President and CEO (October 1995 to August 1997) of James River Corp. of Virginia.  Marsh also sits on the Boards of CATX Corporation and Whirlpool Corporation.  As of December 14, 2004, as detailed in Morgan Stanley's most recent proxy filed with the SEC on February 15, 2005, defendant Marsh will receive close to $300,000 in total compensation for being a member of Morgan Stanley's Board and owned 94,542 shares of Morgan Stanley common stock.  Further:

(a)     Defendant Marsh has long-standing business connections with other Morgan Stanley directors.  Along with defendant Kidder, Marsh used to work for defendant Miles while they were at Kraft Foods.  Defendants Miles, as head of the Nominating Committee of Morgan Stanley's Board, was responsible for recruiting Marsh to join the Morgan Stanley Board.  Defendant Marsh is also one of five current Morgan Stanley Board members who also sat on the Dean Witter board prior to the merger.  Along, with defendants' Brennan, Kidder, Miles and Purcell, Marsh was on the Dean Witter board prior to the merger.

(b)     Further, Marsh is one of five Morgan Stanley directors who were partners at the international consulting firm McKinsey & Co.  These directors include defendants Davies, Kidder, Purcell and Zumwinkel.

48.     Defendant Michael A. Miles ("Miles") has been a member of Morgan Stanley's Board of Directors since the merger and sat on Dean Witter's board since January 1995 and from 1993 to May 1994.  Miles is currently a Special Limited Partner (since January 1995) in Forstmann Little & Co and sits on the Boards of Time Warner, Inc., Dell, Inc., AMR Corp. and Citadel Broadcasting Corporation.  As of December 14, 2004, as detailed in Morgan Stanley's most recent

proxy filed with the SEC on February 15, 2005, defendant Miles will receive close to $300,000 in total compensation for being a member of Morgan Stanley's Board and owned 145,501 shares of Morgan Stanley common stock.  Further:

(a)    Defendant Miles has long-standing business connections with other Morgan Stanley directors, especially defendant Purcell.  The two used to work together at Sears where they reported to defendant Brennan.  Since the merger, defendant Miles has held the Chair position on the Morgan Stanley Board's Nominating Committee and has assisted defendant Purcell in maintaining power over the Company and control over the Board.  Defendant Purcell fed nominations to the Board directly to defendant Miles.

(b)    Defendants Kidder and Marsh both reported to Miles when all three worked at Kraft Foods.  As Chair of the Nominating Committee, Miles was responsible for recruiting Marsh and Kidder to join Morgan Stanley's Board.

(c)    Defendant Miles is also one of five current Morgan Stanley Board members who also sat on the Dean Witter board prior to the merger.  Along, with defendants' Brennan, Kidder, Marsh and Purcell, Miles was on the Dean Witter board prior to the merger.

(d)    Miles also sits on the Board of AMR Corp. with Purcell.

49.    Defendant Laura D'Andrea Tyson ("Tyson") has been a member of Morgan Stanley's Board of Directors  since 1997.  Tyson is currently the Dean of London Business School since January 2002.  Formerly, Tyson was Dean from July 1998 to December 2001, the Class of 1939 Chair in Economics and Business Administration (from January 1997 to July 1998) at the Walter A. Haas School of Business at the University of California, Berkeley and Chair of the President's National Economic Council (February 1995 to December 1996).  As of December 14, 2004, as detailed in Morgan Stanley's most recent proxy filed with the SEC on February 15, 2005, defendant

Tyson will receive close to $300,000 in total compensation for being a member of Morgan Stanley's Board and owned 70,555 shares of Morgan Stanley common stock. Tyson also sits on the Board of SBC Communications with defendant Knight and is also on the Board of Eastman Kodak Company.

50.     Defendant Klaus Zumwinkel ("Zumwinkel") has been a member of Morgan Stanley's Board of Directors since 2004. Zumwinkel is Chairman of the Board of Management, Deutsche Post AG, Corp and is also on the Board of Deutsche Lufthansa AG, Deutsche Telekom AG, Karstadt Quelle AG, and Deutsche Postbank AG. As of December 14, 2004, as detailed in Morgan Stanley's most recent proxy filed with the SEC on February 15, 2005, defendant Zumwinkel will receive close to $300,000 in total compensation for being a member of Morgan Stanley's Board and owned 16,000 shares of Morgan Stanley common stock. Further, Zumwinkel is one of five Morgan Stanley directors who were partners at the international consulting firm McKinsey & Co. These directors include defendants Davies, Kidder, Marsh and Purcell.

51.     Defendant Donald Kempf ("Kempf") has been general counsel for Morgan Stanley from 1999 to July 18, 2005 when he resigned in the wake of the Coleman/Sunbeam litigation disaster. Kempf was hand-picked for his post by Purcell who was a close personal friend of Kempf because he knew Kempf would be personally loyal to him and place his interests above Morgan Stanley's in making decisions or giving adverse recommendations to the Morgan Stanley Board. Kempf committed acts of malpractice by engaging in unethical and/or illegal acts during litigation involving Morgan Stanley, including hiding or failing to produce evidence.

52.     Defendant Kirkland & Ellis has been Morgan Stanley's outside law firm for several years. Kirkland & Ellis is a law firm headquartered in Chicago. Defendant Kempf was formerly a partner in Kirkland & Ellis. Kirkland & Ellis owed their position as outside counsel to Morgan Stanley to Kempf and Purcell, who selected them. Kirkland & Ellis committed acts of malpractice

in representing Morgan Stanley by engaging in unethical and/or illegal acts during litigation

involving Morgan Stanley, including hiding or failing to produce evidence.

## DUTIES OF THE DIRECTOR DEFENDANTS

53.     By reason of their positions as the highest ranking officers and directors of the

Company and because of their ability to control the business and corporate affairs of the Company,

the Director Defendants owed the Company and its shareholders the fiduciary obligations to exercise

a high degree of due care, loyalty and diligence in the management and administration of the affairs

of the Company, as well as in the use and preservation of its property and assets.  The Director

Defendants were and are required to act in furtherance of the best interests of the Company and its

shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest

or benefit.  As a result of these duties, the Director Defendants are obligated to use their best efforts

to act in the interests of the Company and shareholders to ensure that no waste of corporate assets

occurs.

54.     The Director Defendants, because of their positions of control and authority as

directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein.

55.     To discharge their duties, the officers and directors of the Company were required to

exercise reasonable and prudent supervision over the management, policies, practices and controls of

the Company.  By virtue of such duties, the officers and directors of the Company were required to,

among other things:

        (a)     ensure that the affairs of the Company were conducted in an efficient, business

like manner so as to make it possible to provide the highest quality performance of their business;

        (b)     ensure that the Company was operated in a diligent, honest and prudent manner

and complied with all applicable federal and state laws, rules, regulations and requirements, including

- 34 -

complying with rules and regulations issued by the SEC, state regulatory agencies and state and federal courts before which the Company appears as a party;

(c)     exercise good faith in ensuring that the Company has adequate internal controls such that it is capable of complying with federal and state law to preserve and easily retrieve e-mail and that the Company was actually complying with such laws;

(d)     exercise good faith in supervising the preparation and filing of all reports required by law, including reports filed with the SEC, and in examining and evaluating such reports and other information concerning the affairs of the Company; and

(e)     exercise good faith in remaining informed regarding the affairs of the Company, including, but not limited to, the Company's hiring and firing practices of senior management and directors, the Company's compliance with federal and state law and court orders to which it is subject, and, upon receipt of notice or information regarding imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith and take steps to correct such conditions or practices.

56.     The Director Defendants, particularly the members of the Audit Committee, were and are responsible for maintaining and establishing adequate internal controls for Morgan Stanley. Among other things, the Director Defendants were required to devise and maintain a system of internal controls sufficient to provide reasonable assurances that:

(a)     e-mail was retained in a fashion that it could be retrieved quickly and efficiently without tremendous cost; and

(b)     the Company was complying with federal and state law and complying with legal and ethical rules and obligations in litigation.

57.     As alleged in detail below, the Director Defendants failed to implement and maintain an adequate internal control system for the Company, and thereby violated their fiduciary duties of loyalty and good faith.

58.     The Director Defendants further breached their duties of loyalty and good faith by allowing defendant Purcell unfettered discretion to have total control over the Company and make what ever changes to upper management and the Company's Board he felt necessary to preserve his power and thereby causing Morgan Stanley to commit corporate waste.

59.     The Director Defendants breached their duties of loyalty and good faith by failing to ensure that Morgan Stanley and its legal department were capable of and in fact were complying with federal and state law requiring the Company to preserve e-mail.  Further, the Director Defendants breached the duty to exercise a high degree of due care and diligence to ensure Morgan Stanley and the legal department were capable of and in fact complying with court orders regarding preserving and producing e-mail because the Director Defendants were on notice that through defendant Purcell's and general counsel Kempf's and Kirkland & Ellis's improper litigation tactics the Company was in the practice of flaunting federal and state laws and courts orders requiring e-mail to be produced. Yet despite this prior history of recurring run-ins with regulators and various courts, the Director Defendants breached their obligations to the Company and its shareholders by ignoring the direct warnings which demonstrated that the Company's legal department was out of control  As a result of failing to ensure the Company's ability to comply and actual compliance with federal and state laws and court orders, Morgan Stanley has now suffered hundreds of millions of dollars in compensatory and punitive damage verdicts entered at least in part because of the Company's hard-ball litigation tactics to delay and avoid complying with its obligations to produce e-mail.

60.     As a result of the Director Defendants' breach of duties to the Company and shareholders, Morgan Stanley has expended in excess of $109.4 million in departure payments for defendants Purcell and Crawford.

## FACTUAL ALLEGATIONS

61.     On June 13, 2005, Morgan Stanley announced that defendant Purcell would resign. On June 30, 2005, Morgan Stanley announced that Mack was Morgan Stanley's new Chairman/CEO.  On July 7, 2005, it was announced that the total value of defendant Purcell's departure payments were $113.7 million.  This included $34.7 million of restricted Morgan Stanley stock, which would have been forfeited by Purcell if he had been terminated for cause.  Purcell also received a departure bonus worth $42.7 million even though this one-time payment was not in his original employment contract.  The Director Defendants also agreed to give defendant Purcell $250,000 in expenses and $250,000 in charitable donations a year in his name for life.  These amounts are in addition to a $1.27 million annual pension and $20 million in stock options.  These payments were excessive and reward Purcell for a failing performance record and acts of mismanagement.  In addition to this package for Purcell, the Board also gave excessive payments to defendant Crawford of $32 million, paying him for his loyalty to Purcell, as well as his own acts of mismanagement.  By agreeing to make these excessive payments, the Director Defendants breached their fiduciary obligations not to waste corporate assets.

**Defendant Purcell's Efforts to Entrench Himself Caused an Unprecedented Brain Drain Which Resulted in Damage to Morgan Stanley and Waste of Its Assets**

62.     On December 9, 2004, Scott Sipprelle, a former Managing Director at Morgan Stanley who runs a hedge fund, sent a letter to the Morgan Stanley Board ("Sipprelle letter") asserting that the Morgan Stanley/Dean Witter merger was a failure.  Sipprelle urged the Morgan Stanley Board to consider breaking up the firm.

63.     Just four days after the Sipprelle letter, in reaction to the first signs of a shareholder revolt, Purcell unilaterally reappointed defendant Brennan to Morgan Stanley's Board.  Brennan had just retired in October 2003, but nonetheless was reappointed, even though at age 71 he was past the Board's mandatory retirement age of 70.  Purcell brought Brennan back to the Board because he knew he had the complete loyalty and support of his former mentor and boss from Sears Roebuck and fellow Dean Witter director.  Brennan was reappointed to the Board without Purcell seeking or obtaining shareholder approval.  Purcell's failure to obtain shareholder approval for Brennan's reinstatement to the Board is consistent with his prior complete and total domination of the Board.

64.     Purcell did not seek shareholder approval for Brennan's reinstatement because such approval would have been difficult if not impossible to obtain given that Brennan's reinstatement served only to protect Purcell's position and had no legitimate business purpose.  By putting Brennan back on the Board, Purcell's position at Morgan Stanley was enhanced because the super-majority vote of 75% of the Board to oust him was made less likely.  With Brennan and three other former Dean Witter directors, *i.e.*, Kidder, Marsh and Miles, five of 11 Morgan Stanley Board members were former pre-merger allies and friends of Purcell who owed their Board positions to him.

65.     On March 3, 2005, Morgan Stanley's shareholders' dissent from the Purcell cult escalated when Morgan Stanley's Board received a letter from eight former Morgan Stanley executives known as the Group of 8.  That letter set forth an extraordinary indictment of the failure of Purcell and the Morgan Stanley Board.  It stated, in part:

> As retired senior executives of Morgan Stanley and significant shareholders, we care deeply about the Firm, its employees and its reputation for integrity and excellence.  The Firm's commitment to excellence is the product of generations of professionals who worked, and sacrificed, tirelessly to assure that Morgan Stanley provided its clients with products and services which represented the highest standards in the industry.

- 38 -

Unfortunately, Morgan Stanley's performance over the past few years and its reputation have declined to the point where we are greatly concerned about the Firm's ability to regain its position as the premier global financial services firm.

Our perception of Morgan Stanley's decline is corroborated by the judgment of the equity markets. For example, the Morgan Stanley 2005 Proxy Materials show that, over the last five years, the Firm's total return has trailed the S&P Diversified Financial Index by nearly 40%, a stunning vote of no confidence for a company that has historically been a market leader. According to an article published in the International Herald Tribune on February 9, 2005, Morgan Stanley's stock was down 27 percent over the past four years, compared with a 4 percent gain for Goldman Sachs, an 18 percent gain for Lehman Brothers and an 11 percent decline for Merrill Lynch. Moreover, the Firm's stock price volatility has been significantly higher than that of other companies in its peer group, a fact which belies the claimed benefits of the Firm's diversified business portfolio.

We believe that the stock's poor performance and price volatility are a function of many factors, including:

(i)      the failure to continue to earn a premium return on equity;

(ii)     the failure to maintain earnings growth relative to its peers; and

(iii)    the weak performance of the Firm's retail and investment management businesses over the past five years.

More fundamentally, we believe that the overriding cause of the Firm's poor performance is a failure of leadership by you as the Firm's CEO.

Morgan Stanley's role as a leader in the securities industry and its reputation for excellence have always been a function of its ability to attract outstanding professionals and provide strong and supportive leadership. We are deeply concerned that there is a crisis of confidence in the Firm's leadership and governance not only in the market, but also, we fear, among employees of the Firm. We believe that you will not be able to inspire and lead the Firm back to its rightful position in the financial services industry. We also question whether you have the respect of industry peers or the Firm's regulators necessary to the task of regaining Morgan Stanley's leadership position in our industry.

We note that there is very little financial services experience among the independent directors and there is no Institutional Securities executive on the Board despite that unit's disproportionate contribution to the Firm's profits and reputation. In addition, while the Firm is headquartered in New York, the financial capital of the world, neither the Chairman nor any members of the Board reside in the New York area.

We believe that the loss of morale caused by these factors puts Morgan Stanley at great risk of losing more key professionals which would adversely impact

the Firm's ability to serve its clients and to attract the staff necessary to carry on its businesses.

      For all these reasons it is imperative that the Board act promptly to change the leadership and governance of Morgan Stanley.  It is absolutely critical that your successor be experienced and well respected by the senior executive group.  This change should be accomplished as soon as possible.

      We would also recommend the appointment of three outside directors with experience in financial services.  At least one of these directors should have experience in institutional securities while another should be experienced in the retail securities business.  These additions to the Board could be accomplished with or without increasing the size of the Board.

      The signors of this letter include a number of former senior executives and board members of Morgan Stanley.  We are fearful that in reaction to this letter you may reassign or remove more of the senior executives from the Institutional Securities Group.  ***Such action would damage the Firm's ability to improve its long term business prospects, would undermine the Firm's reputation and, perhaps irretrievably, injure its ability to attract and retain talented professionals***.

66.    After the Group of 8 letter became public, on March 21, 2005, *BusinessWeek* reported that:

Purcell is under fire. Integrating the two firms has proven much tougher than many investors expected.... [T]he former Dean Witter operations are laggards as Morgan plays catch-up with rivals who have bigger and more profitable retail brokerage and credit-card outfits.  Almost eight years into the merger, the investment bank is still doing the heavy lifting, accounting for 62% of operating earnings. The brokerage contributes just 6%.

            \*      \*      \*

***The criticism Purcell is facing is especially stinging because he has been in complete control of the firm***.  Since former President John J. Mack left in 2001, every division now reports directly to Purcell.  What's more, the underperforming units were part of Dean Witter, where Purcell served as CEO when he engineered the $10 billion takeover of Morgan.  The firm's lackluster share price has even sparked speculation that Purcell might some day be forced to sell Morgan Stanley ....

67.    In response to the public criticism of his actions, Purcell unilaterally took steps to further entrench his position and protect himself.  Purcell's efforts have had disastrous consequences on the firm and have caused corporate waste totaling hundreds of millions of dollars.  Purcell first

made senior investment banking executives from the firm's upper management committee, who he perceived might be sympathetic to the concerns raised by the Group of 8, swear an oath of personal loyalty to him.  The choice given senior management was simple: swear personal allegiance to Purcell or be forced out of the firm.  When key top investment bankers to Purcell declared their loyalty to Morgan Stanley – **the firm**, not Purcell personally – Purcell took revenge on them and Morgan Stanley quickly suffered a devastating loss of top producers and current and future leaders of the firm who were the main reason why many clients had selected Morgan Stanley in the first place.  After key top members of the firm refused to swear an oath of allegiance to Purcell, he unilaterally implemented a major shakeup of senior management, again while the Morgan Stanley Board watched, abdicating its obligation to control to an imperial, self-aggrandizing CEO bent on revenge, not the best interest of the firm.  This was a disaster, as Morgan Stanley hemorrhaged top talent as a result.  Purcell named Crawford and Zoe Cruz as co-presidents, reporting to him and succeeding Newhouse.  As had been feared by the Group of 8, their letter raising legal concerns had resulted in the Board letting Purcell attack and oust high-level company executives, which shored-up Purcell's position by elevating people loyal to him, but hurt Morgan Stanley.

68.    On March 29, 2005, *Dow Jones Newswires* reported:

Morgan Stanley's most vocal critic, hedge-fund operator Scott Sipprelle, said Chief Executive Philip Purcell's naming of new presidents fails to fix the firm's problems.

"Far from improving business focus, enhancing efficiency, or uplifting employee morale," Sipprelle wrote in an e-mailed statement Tuesday.  [sic] "Mr. Purcell's actions today serve merely to further insulate this failing regime by naming *new lieutenants known principally for their well-compensated personal allegiance to him.  Phil Purcell's actions today are a clear indication of a company governed by one man's personal fiat.*"

\*      \*      \*

"*To all external appearances, the majority of Morgan Stanley's Board of Directors have now become complicit in an abdication of governance in deference to a strong-willed CEO,*" Sipprelle wrote ....

- 41 -

69.     As a result of promoting Cruz and Crawford to the positions of co-presidents over more senior and qualified investment bankers, Purcell caused a massive "brain drain" that was very detrimental to Morgan Stanley.  The Morgan Stanley Board went along with Purcell's actions, even though they served no legitimate business purpose, were intended to benefit Purcell by entrenching him and damaged Morgan Stanley.  The investment banking operations at the Company were responsible for 62% of the Company's profits and no rational business purpose could be served by losing the seasoned veterans responsible for the majority of Morgan Stanley's profits.  The first casualties were Vikram Pandit and John Havens.

70.     On March 30, 2005, *The Wall Street Journal* reported:

> A bitter internal struggle at blue-chip Wall Street giant Morgan Stanley intensified yesterday as two top executives resigned after Chief Executive Philip Purcell moved swiftly to shore up internal support after new criticism of his leadership.

> Yesterday, institutional-securities President Vikram Pandit, 48 years old, and head of institutional equities John Havens, also 48, resigned, the company said.  Mr. Havens exited Morgan Stanley's block-long fifth-floor trading area at 11 a.m. Eastern time to a standing ovation, according to people familiar with the matter.

> The departures followed the announcement late Monday that Stephen Crawford and Zoe Cruz were being promoted to the roles of co-presidents, making them potential successors to the financial-services concern's top job.  They succeed Stephan Newhouse, whose future at Morgan Stanley remains unclear.

71.     Quickly, three other members from Morgan Stanley's 14-member management committee left the firm.  Stephan Newhouse, President, Joseph R. Perrella – one of the top two investment bankers at Morgan Stanley, head of Corporate Finance in 1995 and head of Investment Banking in 1997 – and Tavek Abdel-Meguid, one of the top two investment bankers at Morgan Stanley, all left the firm rather than continue to work in an atmosphere of incompetence and the cult of Purcell.  Altogether, five of 14 members of the Company's top Management Committee resigned due to Purcell's attempt to aggrandize his own position and entrench himself.

72.     In addition to the devastating loss of five of 14 Management Committee members listed above, Purcell's management purges and refusal to operate Morgan Stanley as a meritocracy, instead basing promotions on loyalty to him alone, has caused an astounding loss of talent, including, but not limited to the following:

(a)     On March 30, 2005, Guru Ramakrishnan, global head of Institutional Equity Trading, left.

(b)     On March 30, 2005, Scott Bondurant left.

(c)     On April 5, 2005, Jonathan Barton left.

(d)     On April 7, 2005, Vikram Gandhi, one of the 3 co-heads of the worldwide Financial Institutions Group, left.

(e)     On April 8, 2005, Brian Leach, senior risk management executive who worked for Pandit, left.

(f)     On April 13, 2005, George James, senior bond executive who headed credit products group in Fixed-Income Division, left.

(g)     On April 18, 2005, *The New York Times* reported:

Last week, three more managing directors left the firm: Jamie Greenwald, head of global product innovation, who worked in the firm's equities division for John P. Havens, another recently departed executive; Raju H. Panjwani, a close ally of Mr. Pandit who oversaw the firm's nascent outsourcing operations in India; and James O'Brien, a senior manager in the firm's fixed-income unit.

*          *          *

Historically, Morgan Stanley has reaped a substantial dividend from the lure of its name: bankers would spend their careers at the firm, mostly turning up their noses at recruiting pitches, secure in the knowledge that they were Morgan Stanley men and women and could spurn the additional millions they might get at a lesser rival.

Part of the bond was the meritocratic culture that finally began to sink in at the firm in the early 1980's, when a generation of mostly male, white and Ivy League-bred bankers made way for a new wave of ambitious bankers and traders.

- 43 -

Many of these were in the mold of Mr. Pandit, who hails from a middle-class family in India and rose through the ranks on his intellect and abilities.

With Mr. Purcell's new focus on loyalty -- Mr. Pandit was forced out because he declared his fidelity to Morgan Stanley, not Mr. Purcell -- and the rapid promotion of Stephen S. Crawford and Zoe Cruz to co-presidents, many investment bankers claim that the firm's spirit of meritocracy is fading. Consequently, they have become more open to listening to recruiting pitches from competing firms.

(h)     On April 20, 2005, Morgan Stanley's head cash equity trader, Robert Karofsky, and seven other traders left.

(i)     On April 21, 2005, *The New York Times* reported:

*Morgan Stanley was shaken by another round of defections yesterday as eight senior traders left the firm for Deutsche Bank, adding to a stream of executive departures in recent weeks*.

In some ways, yesterday's resignations may be the most painful yet for Philip J. Purcell, Morgan Stanley's embattled chief executive. Unlike many of those who previously departed, the eight stock traders, three of whom were managing directors, *represented the next generation of young, elite Morgan Stanley talent that Mr. Purcell and his team have been trying to cultivate*.

The traders were approached 10 days ago by Deutsche Bank, in the wake of the forced resignation of their department head, John P. Havens, suggesting that Mr. Purcell may have underestimated the extent to which the firm's top traders and bankers have remained loyal to their former bosses.

That the traders would leave Morgan Stanley's top-ranked equity business for Deutsche Bank, which is a second-tier player in equities, gives credence to a growing feeling within the firm that the vaunted Morgan Stanley brand may not be enough to keep its best revenue producers within the fold given current levels of discontent.

*            *            *

Among the traders who left, Robert Karofsky, 38, was the biggest loss for the firm. He was responsible for trading a broad range of stocks within the equities division. He also had close ties to Mr. Havens, the former head of equities who was forced to resign this month, and felt uncomfortable working for his successor, according to a person close to the situation.

Another one of those leaving yesterday was Thomas M. Juterbock, a managing director with 20 years experience who once ran the government bond desk.

- 44 -

(j)      On April 24, 2005, William Kourakos, who once ran the High-Yield Bond Division, responsible for hundreds of millions of dollars in revenue, and a Managing Director with 20 years experience, left.

(k)      On April 25, 2005, Jim Vore, a Hedge Fund sales specialist, left.

(l)      On May 14, 2005, D. Jeffrey Penney, a Managing Director who worked in equities hedge fund coverage and relationship management, left.

(m)      On May 10, 2005, Jonathan R. Blau and Harvey L. Radler from the firm's brokerage division, left.

(n)      On May 11, 2005, Bradford Hu, responsible for feeding institutional side products to the individual side, left.

(o)      On May 23, 2005, Raymond J. McGuire, co-head of Mergers & Acquisitions, left.

(p)      In May 2005, Mayree C. Clark, a former head of Global Research and head of the International Brokerage Division, left.

(q)      On June 7, 2005 *The New York Times* reported:

Another senior executive resigned from Morgan Stanley yesterday, extending what has become a stream of departures from the investment bank.

David J. Topper, a managing director in the capital markets unit who has been with the firm for 22 years, resigned yesterday and is expected to join one of Morgan Stanley's competitors, J.P. Morgan Chase, as co-head of its equity capital markets division in the United States, according to executives who have been briefed on his plans.

*        *        *

Mr. Topper was the chairman of the equity capital committee, which signs off on public offerings underwritten by the firm.  Underscoring the depth of his ties with Morgan Stanley's top clients, Mr. Topper was also a member of an elite team of investment bankers, overseen by Joseph R. Perella, the former vice chairman, that focused exclusively on drumming up business for the investment bank.

- 45 -

Morgan Stanley's underwriting business is in many ways the cream of its franchise – along with its mergers and acquisitions division....

Mr. Topper, according to those who have worked with him, represented the type of banker who, having spent his entire career with the firm, could not picture working anywhere else.  He joined the firm in 1983, became a managing director within 10 years, and became a central cog in the Morgan Stanley underwriting machine.

(r)    On June 8, 2005, *The Wall Street Journal* reported:

Just this week, Morgan lost a senior capital-markets executive, David Topper, to J.P. Morgan Chase & Co.  And Citigroup Inc. announced yesterday that its private bank hired Marianne Hay, head of Morgan Stanley's private-wealth operations in Europe and the Middle East, to be CEO of its European wealth-management division.

(s)    On June 10, 2005, a team of nine members of the equity derivations division left.

73.    Many of these top professionals left Morgan Stanley to join competitors like Wachovia, Deutsche Bank, First Boston, J.P. Morgan, Smith Barney and Barclay's – further damaging Morgan Stanley's competitive position.

74.    The Board's duty to use care and diligence in attending to the affairs of the Company and ensure no corporate waste occurs mandated that the Board oversee defendant Purcell's unilateral actions to entrench himself in his position at the firm.  Their duty to use diligence was heightened because Purcell had demonstrated that he made management changes for no legitimate business purpose.  The Board's obligation to act diligently was also heightened given that they were on notice that Purcell would purge top performers from the investment banking side solely to entrench his position, as he did when he received the Group of 8's March 3, 2005 letter.

75.    On April 20, 2005 *Reuters* reported:

Morgan Stanley is handing out lucrative retention bonuses to select members of its senior ranks, in an attempt to stem a series of resignations at the battle-torn Wall Street firm ....

Morgan Stanley is facing a campaign of criticism from a group of eight former executives who want to oust Chief Executive Philip Purcell, who they believe has taken the firm in the wrong strategic direction and promoted his own favourites.

*      *      *

The Post, citing people familiar with the matter, reported that Morgan Stanley has offered a dozen top bankers "incentive" awards, or stock grants ranging from $4 million to $7 million.

76.     To date, Morgan Stanley has had to pay hundreds of millions of dollars to retain people who, had defendant Purcell not conducted a management purge, would have stayed at the firm **with no additional compensation**.

77.     Despite these warnings and the fact that the investment banking side generates 62% of the firm's profits, the Board acquiesced in the massive and ongoing brain drain.  As a direct result of the Board's failure to exercise diligence over Morgan Stanley's business and operations – and its CEO – and to prevent corporate waste, Morgan Stanley paid millions in departure bonuses to buy the silence of those Purcell forced out and then had to pay millions more in retention bonuses in an attempt to prevent further departures – a wholly unnecessary cycle of waste of assets due to Purcell's misconduct.

78.     In addition to losing the talented professionals listed above, the Director Defendants compounded their wrongdoing by allowing defendant Purcell to use corporate money to cloak the departures of top executives in secrecy, buying the silence of departing executives who were not allowed to speak ill of Purcell or the Morgan Stanley Board.  According to the terms of their exit agreements, Joseph Perella and Tavek Meguid are prohibited from discussing the reasons for their departures or meeting or cooperating with the Group of 8.

79.     On May 23, 2005 *The Globe and Mail* reported:

In rapid fire last week, two more disturbing bits of news emerged from Morgan Stanley, besides the Perelman debacle.  One was that its respected former heads of investment banking — the legendary Joe Perella and Terry Maguid [sic] —

- 47 -

are to be paid millions in severance, *in part for agreeing not to say anything bad about the company or join with the dissident group seeking to break up the firm*.

80.     Allowing Purcell to use corporate funds to make top producers who were forced out remain silent about his and the Board's misdeeds and misconduct is adverse to the best interests of the shareholders who are entitled to know why leaders of the Company's most productive business segment are leaving.  Shareholders are entitled to all information which would enlighten them as to the Company's future business performance.  It is impossible for shareholders to evaluate whether Morgan Stanley, under the leadership of the existing Board of Directors, will continue to be able to attract top tier transactions and attract and retain the top talent necessary to land those transactions, if the reason for the current talent loss remain a secret.

81.     Morgan Stanley's business has been damaged by Purcell's domination of the Board and their actions to entrench their positions.  On April 29, 2005, it was revealed that Morgan Stanley was dropped as an underwriter for an initial public offering for Reliant Pharmaceuticals, Inc., a deal it was to co-lead with Goldman Sachs.  It was also reported that Morgan Stanley was downgraded in BCBG Max Azria Group's IPO to co-lead with Goldman Sachs who was added to the underwriting line-up.  Morgan Stanley's positions in these transactions were downgraded because people at those companies were concerned about the disruption at Morgan Stanley.

82.     On May 10, 2005, *The Wall Street Journal* reported that Morgan Stanley slipped to No. 4 from No. 1 in global stock and stock-related underwritings from the prior year:

> The departures of heavy hitters also could drag down second-quarter earnings.  Just last week, it lost out to Goldman Sachs Group Inc. for handling the initial public offering of stock in graphic-design and Internet-printing concern VistaPrint Ltd., people familiar with the matter say.  Morgan has slipped to No. 4 in global stock and stock-related underwriting year to date from No. 1 a year ago.  It is No. 1 in global IPOs and announced merger-and-acquisition advice to date, according to data provider Thomson Financial.

83.     Then on June 13, 2005, Morgan Stanley issued a profit warning which stated that the Company expected Q2 2005 profits to be 15%-20% below the $1.10 earnings per share achieved in Q2 2004.

**The Coleman Litigation Verdicts – Awarding Over $1.5 billion in Damages – Are the Direct Result of Morgan Stanley's and its Lawyers', Defendants Kempf and Kirkland & Ellis, Improper and Unethical Conduct and the Board's Breach of Fiduciary Duties to Shareholders**

84.     On May 16, 2005, a Palm Beach County jury awarded Ronald Perelman $604.3 million in compensation damages against Morgan Stanley for its role in fraudulently deceiving Perelman when he sold his Coleman camping equipment company to Sunbeam Corp. in 1998.  On May 18, 2004, the same jury awarded Perelman another $850 million in punitive damages in the same matter.  On June 24, 2005, the Florida court added $130 million to the verdicts in the litigation bringing the total to $1.58 billion.  These verdicts were the direct result of the Director Defendants', Morgan Stanley's and its lawyers' improper and unethical conduct in hiding millions of pages of evidence, conduct that is reflected in a long course of conduct of litigation misbehavior.  These verdicts are also the direct result of the Director Defendants' breaches of fiduciary duties to ensure the Company had adequate internal controls so that it could and in fact was complying with federal law requiring that e-mail be preserved.

85.     On May 17, 2005, *The New York Times* reported:

> Morgan Stanley was hit with a daunting legal blow yesterday as a Florida jury awarded $604 million in damages to the financier Ronald O. Perelman, who contended the investment bank defrauded him in a 1998 deal.

> *          *          *

> But from the beginning, according to Judge Elizabeth T. Maass, the Florida judge hearing the case, Mr. Kempf and Morgan Stanley's legal team were obstructionist in their conduct, going so far as to hold back e-mail evidence requests made by Mr. Perelman.

So blatant did she find the firm's behavior, that Judge Maass ruled in March that she would instruct the jury to take as granted that Morgan Stanley was complicit in the financial fraud committed at Sunbeam.

\*      \*      \*

***Under Mr. Kempf, who became chief counsel in 1999, Morgan Stanley has had several run-ins with regulators and lawyers over its conduct in providing e-mail evidence.  In 2002, the firm, along with four others, was fined $8.25 million for not complying with e-mail retention rules***.

86.     On May 18, 2005, *The Associated Press* reported:

Billionaire financier Ron Perelman added $1.45 billion to his bank accounts this week, at least on paper, as a jury decided that investment firm Morgan Stanley acted fraudulently in Perelman's 1998 sale of his Coleman camping equipment company to Sunbeam Corp.

The Palm Beach County jury Wednesday awarded $850 million in punitive damages, atop the $604.3 million it awarded him in compensatory damages Monday.

\*      \*      \*

***Judge Elizabeth Maass ruled early on that Morgan Stanley helped Sunbeam, an investment banking client, defraud investors because it failed to turn over evidence in the case***.

\*      \*      \*

Sunbeam filed for bankruptcy protection in 2001 after its financial troubles were discovered, and Perelman alleged he lost millions when 14.1 million shares of Sunbeam stock he received in the deal plunged in value.

\*      \*      \*

Perelman claimed Morgan Stanley deceived him because it stood to earn $40 million from Sunbeam's acquisition of Coleman.  ***Scarola told jurors in closing arguments Wednesday that Morgan Stanley kept hidden up to 60 million pages of potential evidence, which was the basis for Maass' ruling***.

"***Morgan Stanley hid evidence. Morgan Stanley destroyed evidence. Morgan Stanley filed false certifications.  Morgan Stanley lied to the court and sought in every way possible to cover up its wrongdoing***," Scarola said.

87.     On May 21, 2005, *The Economist* reported:

Ronald Perelman's $604m win over Morgan Stanley

A Florida court wallops one of Wall Street's top investment banks

*Could the headlines get any worse for Morgan Stanley*?  Already facing an attempt by dissident former managers to unseat its chief executive, on May 16th the investment bank was ordered by a Florida court to pay $604m for defrauding Ronald Perelman, one of America's smartest and richest investors.  Mr. Perelman contended that Morgan Stanley had misled him in 1998 when he agreed to accept shares in its client, a second-rate appliance manufacturer named Sunbeam, in exchange for his controlling interest in Coleman, a supplier of camping equipment.

And yes, things could get worse.  On May 18th, after no more than a brief deliberation, the jury decided to award Mr. Perelman another $850m, this time in punitive damages.

\*         \*         \*

Worse still for the bank, it faced a judge who found its delays and evasive answers to requests intolerable.  "*Many of these failings were done knowingly, deliberately and in bad faith*," concluded Judge Maass, in her critical pre-trial ruling. "*A reasonable juror could conclude that evidence of Morgan Stanley & Co's misconduct demonstrates its consciousness of guilt*."

88.     Given Morgan Stanley's background of flagrantly flaunting its unwillingness to comply with federal law, it is no surprise that Morgan Stanley commenced an all-out discovery war in the Coleman/Sunbeam litigation.  Summarizing this battle, which lasted almost two years, *The Wall Street Journal*, on May 16, 2005, reported:

In May 2003, the process of discovery, in which each side seeks documents from the other, got under way.  As is common in pretrial fencing, Morgan Stanley resisted some requests.  The firm said it would be an invasion of privacy to hand over the personnel files of employees on the Sunbeam account, including William Strong, the account's top banker.  Judge Maass sided in part with Morgan Stanley and limited the request to any documents about the employees' "truthfulness, veracity, or moral turpitude."

Unbeknownst to the Perelman team, Mr. Strong had been tried on bribery charges in Italy in the 1990s stemming from a previous job with Salomon Brothers. He was acquitted after a trial, while working for Morgan Stanley, but the firm didn't produce any documents on the matter.  Mr. Perelman's lawyers stumbled across a news clipping in early 2005 while researching the case.  Morgan Stanley said the information wasn't in Mr. Strong's personnel file and wasn't subject to discovery. The judge said there was "no excuse" for not providing documents about the Italian charges and found that Morgan Stanley "purposefully withheld" the information.

The Perelman team's request for e-mails dating back to 1998 caused a bigger fight. Morgan Stanley said in court filings such a search would require "a massive safari into the remote corners" of backup computer systems. Morgan Stanley argued in court that the search would take months and cost hundreds of thousands of dollars.

Over the next several months, the document tug-of-war grew increasingly hostile. In April 2004, Judge Maass ordered Morgan Stanley to search its "oldest full backup" tapes for e-mails from 36 employees that mentioned 29 key words, including "grill," "camper," "Perelman" and two misspellings of his name. The firm was ordered to turn over all documents not excluded for legal reasons. It also had to sign a certification, an official court document asserting that the instructions had been complied with.

The task of overseeing the search fell to Mr. Riel, then head of Morgan Stanley's technology compliance group. Morgan Stanley says Mr. Riel was overseeing a multimillion-dollar project to put nearly 300 million e-mails into an easily searchable archive. Previously, Morgan Stanley stored e-mails on magnetic tapes. Morgan Stanley says Mr. Riel thought the project was mostly done and searched only the new database.

By early May at the latest -- before Morgan Stanley sent e-mails to the Perelman team -- somebody at the firm unearthed 1,423 computer-backup tapes in a closet in a Brooklyn office building. They hadn't been entered into the archive and no one had looked at them by this point, according to court testimony.

In mid-May, Morgan Stanley sent 1,300 e-mails to Mr. Perelman's attorneys but didn't include the required certification. It wasn't until early June that Mr. Riel told two Morgan Stanley lawyers, Soo-Mi Lee and James Cusick, about the recently discovered Brooklyn tapes -- at the time, he mistakenly said there were 1,600. Mr. Riel told the lawyers he would perform a search and let them know if they contained relevant e-mail.

A couple of weeks later, Mr. Riel signed the certification, although the new tapes had not been searched, according to the judge's written order. In the certification, Mr. Riel said the oldest available tape was dated January 2000. In fact, Mr. Riel and his team determined by early July that the newly discovered tapes went back to the late 1990s, the period at issue in the suit. Morgan Stanley didn't disclose that discovery until November, according to court documents.

Mr. Riel's attorney, Jeffrey Pigano, says his client believed the certification only covered the archive, his area of responsibility, not tapes that hadn't yet been entered into it. In his deposition, Mr. Riel said: "I knew the litigators -- my internal clients -- needed certification . . . and I wanted to satisfy that concern."

A Morgan Stanley spokesman says that in general only a small fraction of its tapes contain e-mail and that it didn't know whether the newly discovered tapes did

so.  As a result, the firm didn't believe it was obligated disclose them when Mr. Riel signed the certification.

In August, Morgan Stanley says it placed Mr. Riel on administrative leave for reasons unrelated to the Perelman case.  The firm accused him of looking through co-workers' e-mail in violation of company policy.  Mr. Pigano says that explanation is "materially misleading."  The attorney notes that his client was called a "whistleblower" by Judge Maass in connection with a separate SEC investigation into Morgan Stanley's relationships with third-party vendors.  Morgan Stanley says "an initial internal investigation of [Mr. Riel's] allegations found no breach of law, regulation, or policy."

Mr. Riel's responsibilities were turned over to Allison Gorman Nachtigal.  She testified that the department faced several problems: It had no written instructions explaining how to search one of its key systems for e-mail; a software bug caused many searches to be case-sensitive; and there was a shortage of computer storage space.  Asked in court why Mr. Riel hadn't addressed the space problem, Ms. Nachtigal responded, "I don't think he was very good at it."

In response, Mr. Riel's attorney, Mr. Pigano, says: "It appears she has absolutely no clue what she is talking about."

At the time, no one told Ms. Nachtigal to merge the newly discovered tapes with the department's database, according to her testimony.  She put the task near the bottom of "a long list."  Ms. Nachtigal hadn't been told about the Perelman lawsuit, she later testified.

In November 2004, at least six months after the backup tapes were found, Morgan Stanley's outside lawyer on the case, Kirkland's Thomas Clare, told the Perelman team that the tapes included "some responsive e-mails."  Morgan Stanley says most of the Brooklyn e-mails were put into the system between May and August.  According to one of Judge Maass's orders, Morgan Stanley began to search the e-mails in November.  The Perelman team demanded to know when the search would be complete so it could look for evidence helpful to its case.

Mr. Clare replied that his client couldn't "accurately estimate," a response Judge Maass later called "his usual stonewall tactic."  The trial was set to start in less than three months.

*          *          *

Ms. Nachtigal was finally told about the Perelman case in mid-January 2005, she testified.  After talking to Morgan Stanley lawyers, she made the matter a higher priority.

For a few days in February it looked as if the firm had solved the problem.  Robert Saunders, another Morgan Stanley tech executive, said in a Florida deposition

that he was confident a complete search for backup tapes had been conducted, according to court documents.

Back in New York a day or so later, he had second thoughts and personally searched Morgan Stanley's storage areas.  In one office in midtown Manhattan he spotted 129 more tapes.

"They were not hard to find.  They were just sitting on that metal shelf," Mr. Saunders said in court.  That day, he found more tapes, including some at Morgan Stanley's headquarters.  Asked in court how certain he was that all tapes in that building had been found, Mr. Saunders responded, "Very confident."

Mr. Saunders's boss, Richard Anfang, wasn't so sure.  He decided to do his own search, he said in court, and turned up yet more tapes.  Mr. Anfang said he planned to criticize his employee over the matter in a future performance review.  "I don't know what was going through his mind," Mr. Anfang testified.

Also in early February, Ms. Nachtigal discovered software problems that prevented Morgan Stanley's system from searching e-mail attachments and from searching 7,000 e-mails sent using a particular software program.  Judge Maass delayed the start of the trial several times in response to the problems.

As the search continued, Morgan Stanley turned over additional e-mail.  It says none of the e-mail discovered since the initial batch was handed over in May 2004 "is supportive of [Mr. Perelman's] underlying claims."  A Morgan Stanley spokesman says the firm repeatedly offered to pay the court to delay the trial to give itself time to fix the problems.

A spokeswoman for Mr. Perelman says the additional e-mail from Morgan Stanley produced "significant information" helpful to the businessman's case.

As March rolled around, Judge Maass decided she'd had enough.  On March 1, she granted Mr. Perelman's request for a so-called "adverse inference" order.  This is an extreme legal remedy that reverses the standard burden of proof.  In a civil case, it's typically the litigant that needs to prove its case -- that is, Mr. Perelman's camp.  Instead, Judge Maass said Morgan Stanley would have to prove it wasn't at fault because of the "willful and gross abuse of its discovery obligations."

"A reasonable jury could conclude that evidence of [Morgan Stanley's] misconduct demonstrates consciousness of guilt," she wrote in a court order.

\*      \*      \*

A day later, Judge Maass issued a partial default judgment against Morgan Stanley, essentially handing an automatic loss to the Wall Street firm, because "the [discovery] abuses have continued unabated."  The judge said she would instruct the jury to assume that the firm had helped defraud Mr. Perelman.

*     *     *

When the trial opened in early April, Judge Maass read the nine-person jury a lengthy statement, saying, in part: "*Morgan Stanley participated in a scheme to mislead [Coleman] and others and cover up the massive fraud at Sunbeam until Morgan Stanley and Sunbeam could close the purchase of Coleman*."

89.     On June 5, 2005, *The New York Times* reported that:

But it is Morgan's own behavior that has come into sharpest focus in its tussle with Mr. Perelman, opening a rare window onto Wall Street's inner workings and the strong-arm tactics of a financial powerhouse.

*Court documents, depositions and other evidence uncovered by Mr. Perelman's lawyers suggest that in 1998 Morgan ignored negative information about Sunbeam, a client that paid it lucrative fees and provided it with steady business*. Morgan had lent $680 million to the company and had underwritten a $750 million Sunbeam debt offering that year. The Florida jury also said Mr. Perelman had relied on Morgan's imprimatur that Sunbeam's financial data were sound -- which ultimately proved not to be the case.

*     *     *

*Morgan was so slow to respond to court orders to produce e-mail messages and other corporate documents that the judge in the case, Elizabeth T. Maass, labeled the moves "an effort to mislead opposing counsel and me*." ...

Although Mr. Perelman said he offered on two occasions to meet with Morgan's chief executive, Philip J. Purcell, to try to negotiate a resolution when the court requested settlement talks, Mr. Purcell demurred. Morgan declined to make any of its executives or lawyers available for interviews for this article, but *analysts say Mr. Purcell and his hand-picked, in-house chief counsel, Donald G. Kempf Jr., are the architects of Morgan's take-no-prisoners litigation policies*. As a verdict in the Perelman case neared, Morgan announced that it had hired a new lawyer to oversee its legal affairs. Mr. Kempf now plans to leave the firm.

90.     The outcome in the Coleman/Sunbeam litigation was directly caused by Purcell's, Kempf's and Kirkland & Ellis's improper litigation tactics which included document and evidence concealment and destruction. Unfortunately, Morgan Stanley shareholders are paying the price. The Coleman/Sunbeam litigation outcome was also directly caused by the Board's failure to exercise a proper degree of due care and diligence in the management and administration of Morgan Stanley's affairs. There were years of warning signs that Morgan Stanley was not complying with federal and

state laws requiring the preservation of e-mail, as demonstrated by the hardball litigation tactics,

refusal to produce evidence, namely e-mail, and defendant Purcell's and Kempf's attempt to cloud

everything in a veil of secrecy.  Purcell and general counsel Kempf hurt Morgan Stanley in the past

by their practice of violating state laws to preserve e-mail.  On May 20, 2005, *Reuters* reported:

> Experts said e-mail retention could be a double-edged sword if not accompanied by corresponding training for employees on the legal implications of e-mails they send.

> When New York Attorney General Eliot Spitzer investigated the research divisions of Wall Street firms five years ago, ***he fined Morgan Stanley a little under $10 million for not having a proper e-mail retention policy in place***.

Despite this, no proper policy was ever put in place.

91.     Despite SEC rules requiring that e-mail be retained, Purcell and Kempf flagrantly

refused to comply with their obligation to retain and produce e-mail.

92.     In November 2002, Morgan Stanley was one of the five firms that together paid

regulators $8.3 million for violating rules requiring securities firms to retain e-mails for three years.

93.     On July 13, 2004, Morgan Stanley settled a sex-discrimination case for $54 million

which included a dispute about e-mails.

94.     Only July 30, 2004, Morgan Stanley was fined $250,000 for failing to hand over

documents in investor-complaint cases.

95.     Two weeks later, in August 2004, Morgan Stanley agreed to pay regulators

$2.2 million for delays in disclosing 1,800 complaints and misconduct incidents.

96.     On May 16, 2005, *The Wall Street Journal* reported:

> The Perelman fight is also the latest in a series of cases in which Morgan Stanley has gotten into trouble over how it stores and turns over documents.  In 2002, the firm, along with five others, paid regulators $8.25 million for violating rules requiring securities firms to retain e-mails for three years.  Last July, it was one of three firms fined $250,000 each for failing to hand over documents in investor-complaint cases.  Two weeks later, it agreed to pay $2.2 million to regulators for delays in disclosing 1,800 complaints and misconduct incidents.

In a sex-discrimination case settled around the same time, Morgan Stanley told the Equal Employment Opportunity Commission that searching for e-mails would be too burdensome and expensive. In response, commission staffers told a federal judge that the firm had a new, "easily searchable" database. A Morgan Stanley spokesman says the system wasn't fully operational at the time because only a small percentage of its older e-mails had been moved over.

\*       \*       \*

Among Wall Street firms, Morgan has sometimes stood out for its combative approach to legal issues. In 2003, when financial firms were settling charges that their stock research was tainted, CEO Mr. Purcell said retail investors needn't be concerned. ***He drew a public rebuke from Securities and Exchange Commission Chairman William Donaldson, who said Mr. Purcell's remarks showed "a troubling lack of contrition***."

Among Mr. Purcell's first hires after arriving at Morgan Stanley in 1997 was trial lawyer Don Kempf, a longtime friend at Kirkland. As Morgan Stanley's chief legal officer, Mr. Kempf also ruffled regulators. While negotiating with the SEC to settle the stock-research case, he told some officials they had been "asleep at the wheel."

97. Incredibly, despite being repeatedly fined for failing to comply with regulations requiring it to preserve documents, Morgan Stanley nonetheless violated the 2002 consent decree with the SEC – pursuant to which it paid $8.25 million in fines – by failing to comply with the obligations to maintain e-mails. As a result, in January 2005, the SEC Division of Enforcement sent Morgan Stanley a "Wells Notice" recommending that the SEC pursue an enforcement action relating to the Company's retention of e-mails and the potential violation of the 2002 Cease and Desist Order.

98. Stunningly, neither defendant Purcell, general counsel Kempf nor any member of the Board disclosed the receipt of the "Wells Notice" in Morgan Stanley's February 15, 2005 Proxy statement as filed with the SEC prior to or during the March 15, 2005 Annual Meeting of Shareholders. ***Recognizing that he was facing a major shareholder revolt, defendant Purcell concealed this information until after the Annual Meeting, and the Board was re-elected after his management purge was in full swing***. This Wells Notice was material information for Morgan

Stanley shareholders to have in deciding whether to re-elect the Morgan Stanley Board members up for re-election.  The reason the Director Defendants did not disclose the "Wells Notice" prior to the March 15, 2005 Annual Shareholders Meeting is clear.  To do so would have forced their admission that, in the midst of a huge management struggle with shareholders, Morgan Stanley was continuously failing to comply with federal law regarding e-mail retention.  This admission would reflect very badly on the Director Defendants, who at the same time Morgan Stanley received the "Wells Notice" had given themselves a big raise, because the Director Defendants were responsible for ensuring that the Company had adequate internal controls to ensure its compliance with laws the Company repeatedly flaunted.  The "Wells Notice," thus, was compelling evidence that the Director Defendants breached their obligation to ensure the Company had adequate internal controls because Morgan Stanley was clearly not capable of complying with federal e-mail retention laws.  This inability, which was ultimately revealed during the course of the Coleman/Sunbeam litigation, was information neither Perelman nor his Board could afford to have revealed during the beginning of a power struggle.

99.     On April 7, 2005, *The New York Times* reported:

> Also yesterday, in a reminder of the firm's persistent regulatory woes, Morgan Stanley said that the Securities and Exchange Commission was investigating its e-mail retention policies.  (In 2002, regulators fined the firm $1.65 million for failing to preserve e-mail messages.)

100.     Purcell's rebuke from SEC Chairman William Donaldson in 2003 was most telling. Morgan Stanley paid $125 million of the total $1.4 billion settlement by Wall Street firms concerning violations by research analysts.  Defendant Purcell publicly emphasized that none of Morgan Stanley's analysts were singled out for violations.  Defendant Purcell drew the rebuke from the SEC Chairman Donaldson who was infuriated because Morgan Stanley was the most prominent

firm involved in a practice of passing on money from companies to other Wall Street firms to produce "independent" research on those companies without disclosure to the public.

101.    Based on years of repeated failures to comply with federal and state laws requiring that e-mail be preserved and repeated instances in which Morgan Stanley flatly refused to produce discovery (even though the Company had just installed new systems to make searching for e-mail fast and easy), the Morgan Stanley Board owed shareholders a duty of diligence and care to ensure the Company would not be harmed by this illegal and unethical conduct.  Defendant Purcell's, general counsel Kempf's and Kirkland & Ellis's hard-nosed strategies were a ticking time bomb waiting to go off.  Unfortunately, the Board of Directors did nothing to defuse the bomb and failed to ensure that the Company had adequate internal controls in place concerning compliance with federal and state laws which mandate preservation of e-mail.  Worse yet, they filed the false February 15, 2005 Proxy Statement to secure an enormous raise pursuant to which they gave themselves an award of 4,000 shares of Morgan Stanley common stock and re-elected four members of the Board.

102.    Defendant Purcell's and general counsel Kempf's  hardball tactics and pattern and practice of lying and cheating during discovery could not have been combined with more adverse facts in the Coleman/Sunbeam litigation.  It bears emphasis that Perelman did not even consider suing Morgan Stanley over its handling of the Coleman transaction until Sunbeam went bankrupt. According to *The New York Times* on June 5, 2005:

> Sunbeam's bankruptcy changed all of that. In the course of suing Andersen in 2001, accusing it of a possible role in Sunbeam's demise, Mr. Perelman's legal team came across a document that they described as a wake-up call.  The document, known as a "comfort letter," was dated March 19, 1998; Andersen sent it to Morgan as the bank prepared Sunbeam's $750 million debt offering.  The letter detailed serious financial troubles at Sunbeam, including escalating debts, sharply decreased sales and mounting losses.
>
> Andersen's letter noted that Sunbeam had booked about $72 million in sales for the first two months of 1998, about half of what sales were for the same period a year earlier.  At the time the letter was written, Wall Street analysts were also

estimating publicly that Sunbeam would book $285 million to $295 million in revenue for the entire first quarter of 1998. Sunbeam issued a press release on March 19 saying that it might not meet sales estimates but that it would exceed the previous year's first-quarter sales of $253 million – an estimate clearly at odds with Andersen's letter.

\*        \*        \*

According to Mr. Perelman's lawsuit, documents that Morgan prepared for the debt offering -- including sales memorandums and scripts that Mr. Dunlap read at road shows promoting it -- misrepresented Sunbeam's financial performance. Morgan, which earned a $22.5 million fee for handling the offering, said it made no misrepresentations related to that transaction.

About a week after the offering closed, Sunbeam said that its sales would not meet analysts' estimates, causing its stock price to plummet about 25 percent. Three years later, Sunbeam was in shreds.

\*        \*        \*

On one early occasion, Mr. Perelman and Mr. Kempf agreed to settle the dispute for just $20 million, according to several people with knowledge of the talks. Although Mr. Kempf reported directly to Mr. Purcell, an executive briefed on the settlement talks said that Tarek F. Abdel-Meguid, former head of investment banking at Morgan, scuttled the deal.

Mr. Meguid declined to comment. Two other executives involved in the dispute between Mr. Perelman and Morgan said the bank's legal department never advised Mr. Meguid that Mr. Perelman's suit had merit. Therefore, they said, Mr. Meguid did not support a settlement.

\*        \*        \*

During the discovery process before the trial, Morgan failed to produce all internal e-mail messages and other documents related to Sunbeam that the court requested, despite the bank's assurances that it had done so. Morgan, after a carnivalesque series of events that it said had led to a sudden unearthing of the material, eventually provided the documents to Mr. Perelman's lawyers. But the material arrived months late, in what the judge described as a "willful and gross abuse of discovery obligations."

\*        \*        \*

"Morgan Stanley finds itself in this position because of what Morgan Stanley has done," she added.

In mid-April, with the trial under way, Morgan sought to have Judge Maass removed from the case, arguing that her "bias, antagonism, and hostility" toward the

company had undermined the integrity of the court proceedings. Morgan's effort was denied twice, first by a lower court and then by a Florida appeals court. About two weeks later, Morgan took aim at the jury. The bank filed a court motion seeking a mistrial, arguing that jury tampering had occurred, but the bank later dropped that effort.

103.    Furthermore, the facts also indicate that Morgan Stanley helped Sunbeam draft the March 19, 1998 press release to ensure the deal would close.

104.    With these facts combined with defendant Purcell's, general counsel Kempf's and Kirkland & Ellis's hardball tactics and penchant for hiding e-mails, it is no surprise that the court presiding in the Coleman/Sunbeam litigation concluded that Morgan Stanley engaged in the fraud and then spent years trying to cover it up. The only reasonable explanation (and the conclusion reached by the court) for Morgan Stanley refusing to produce e-mail and blatantly ignoring court orders was that in typical fashion, Morgan Stanley was trying to hide incriminating evidence.

105.    The Board breached the fiduciary duty to exercise a high degree of care and diligence to ensure the Company had internal controls in place to produce e-mail and that the legal department was actually complying with federal law. By sitting back and doing nothing and giving defendant Purcell unfettered discretion, the Board allowed the Company to incur $1.58 billion in adverse judgments.

106.    Even worse than not ensuring the Company had adequate internal controls in place, was the Board's failure to inquire about resolving the Coleman/Sunbeam litigation when the case could have been settled for $20 million. In 2003, however, defendant Purcell's handpicked ally, general counsel Kempf and his outside law firm, Kirkland & Ellis, knowing they would simply play hide the ball, advised the Company that Perelman's case was meritless. Given the legal department's prior blunders, however, and the glaring facts in the Coleman case, the Boards' conduct in ignoring the warning signs that the Legal Department was off track was inexcusable.

107.    All in all, defendant Purcell compiled a horrendous performance record.  Under his watch, Morgan Stanley suffered massive corporate waste as detailed above and has achieved sub-standard performance compared to its peers.  Morgan Stanley's stock fell 32% between 2000 and 2005 under defendant Purcell's watch while Lehman Brothers' stock more than doubled in the same period.

108.    Despite this performance record and breach of obligations to insure that Morgan Stanley's corporate assets were not wasted, the Director Defendants did not terminate defendant Purcell for cause.  To do so would have required the Director Defendants to admit their own breach of fiduciary obligations to make sure the Company had adequate internal controls to ensure it was in compliance with federal and state law.

109.    Instead of terminating defendant Purcell, the Director Defendants decided to reward his failing track record by not only allowing him to receive the $34.7 million in restricted stock but also paying him a $42.7 million departure bonus.  In addition, after he resigned his seat on the Board, the Director Defendants agreed to a new employment contract with defendant Crawford under which he either would receive $16 million as annual compensation for 2005 and 2006 or a one-time payment of $32 million if he resigned for any reason before August 3, 2005.  Not surprisingly, defendant Crawford announced his resignation on July 11, 2005, in order to collect the $32 million the Director Defendants agreed to give him.

110.    The investment community is outraged.  David Katz, who oversees $2 billion at Matrix Asset Advisors, Inc., called the payouts "disgraceful."  Compensation experts were puzzled by the walkaway periods for defendant Crawford, and David H. Sidwell, Morgan Stanley's Chief Financial Officer who will get $10.5 million for staying until October 2005.  Paul Hodgson with The

Corporate Library said "[t]hese agreements place in their hands incentives to terminate their employment."

## DEMAND FUTILITY

111.    In January 2005, as reflected in Morgan Stanley's February 15, 2005 Proxy, the Board of Directors of Morgan Stanley made a decision to increase their own compensation despite the fact that they had ignored the illegal conduct concerning Morgan Stanley's failure to retain e-mails and had failed to prevent defendant Purcell from dominating the Board and Morgan Stanley through his strong-arm tactics and hand-picking of directors, including returning defendant Brennan to the Board without shareholder approval.  The Director Defendants, except Mack, were on the Board at the time of this decision and approved the compensation increase.  In the same February 15, 2005 Proxy, it was also reported that the Board awarded defendant Purcell a 57% increase in total compensation by increasing it from the $14 million he received in 2003 to $22 million for 2004.  As the Director Defendants each received a personal financial benefit from this challenged action, they are interested and any demand is futile.

112.    On June 30, 2005, the Board of Directors of Morgan Stanley made a decision to pay defendant Purcell $77.4 million and defendant Crawford $32 million as payoffs to leave Morgan Stanley.  This decision was in violation of the business judgment rule as there existed no sound business reason for such excessive payments.  As stated earlier, defendant Purcell had caused a brain drain at Morgan Stanley by his forced loyalty declarations and upper management purge.  Defendant Purcell had also caused Morgan Stanley to continually flaunt the laws and regulations concerning document retention.   Ultimately, this policy cost Morgan Stanley over $1.5 billion in the Coleman/Sunbeam litigation. Because defendant Purcell was responsible for the damages to Morgan Stanley, he should have been fired for cause and not paid an exit payment.  As defendant Crawford stood to earn a little over $10 million in 2005, there were no reasons to enter into the June 30, 2005

agreement with Crawford which gave him a $32 million incentive to resign by August 3, 2005.  As the Director Defendants violated their business judgment in agreeing to the exit payments, demand is futile.

113.    Before deciding to pay defendants Purcell and Crawford $109.4 million in exit payments, the Director Defendants failed to inform themselves of all reasonably available information concerning the propriety of such payments.  Specifically, despite it being widely reported information, the Defendant Defendants failed to inform themselves that Morgan Stanley had a custom and practice of violating laws and regulations concerning document retention, and had paid numerous fines and penalties.  Had the Director Defendants considered this information and took measures to terminate defendant Purcell for cause, he would not have been entitled to receive the $34.7 million in restricted stock and the Board would not have given him a $42.7 million departure bonus equal to roughly twice his 2004 compensation.  If the Director Defendants had considered the disastrous brain drain that occurred as a result of defendant Crawford being made co-president and that he only stood to make $10 million in 2005, the decision to give him a $32 million incentive to resign would not have been made.  As the Director Defendants have not exercised independent informed business judgment, any demand is futile.

114.    The Director Defendants, except Mack, were members of Morgan Stanley's Board of Directors during the period that Morgan Stanley continually violated the laws and regulations concerning document retention.  As members of the Board of Directors, the Director Defendants knew of the many violations of the document retention laws and the numerous fines and penalties paid by Morgan Stanley for such violations, yet failed to correct such practices.  The Director Defendants' failure to correct the illegal practices of which they were aware, and their standing idly by and doing nothing was a breach of their fiduciary duties, for which they face a substantial

- 64 -

likelihood of liability.  To avoid such liability, the Director Defendants' paid defendant Purcell $77.4 million and defendant Crawford $32 million in exit payments and released valid and viable claims in bad faith to silence them and get their cooperation.  Thus, demand upon the Director Defendants is futile.

115.    While Morgan Stanley and its public shareholders have suffered great damage and losses due to the massive corporate waste directly caused by the Board giving complete and total control of the Company to defendant Purcell contrary to the fiduciary obligations and duty of oversight by the Board, the Director Defendants as the CEO and Directors of Morgan Stanley have not only suffered no damages but, in fact, have greatly profited from giving plenary power to defendant Purcell.  In addition to his exit package which includes over $77.4 million in improper payments, defendant Purcell was given an enormous 57% raise in total compensation to $22 million in 2004.  In turn, the directors were also given a huge raise for doing defendant Purcell's bidding. The directors' compensation was raised to $75,000 in salary and $15,000 to chair a committee.  In addition, the annual grant of 6,000 stock options was changed to a flat 4,000 share stock award. Thus, in total the outside directors' salaries were raised to close to $300,000!  Moreover, the Director Defendants gave defendant Purcell a lucrative exit package, including the $77.4 million in restricted stock and a departure bonus and a $32 million incentive to defendant Crawford to resign.

116.    As a result of their giving absolute power and control over the Company to defendant Purcell, the Director Defendants have held onto their positions of power, prestige and profit at Morgan Stanley.  In addition, defendant Mack, by agreeing to the enormous departure payments to Purcell and Crawford, was able to obtain the title and position of power and prestige he had coveted for years. Defendant Crawford has been highly paid for his unwavering loyalty to defendant Purcell, which never would have occurred if defendant Purcell had not been allowed to conduct a house-

cleaning rampage to purge more qualified investment bankers who he perceived as disloyal.  The Directors Defendants, in abdicating control to defendant Purcell and agreeing to give him a 57% raise in a year when the Company's stock was down 4%, have themselves enjoyed a huge increase in compensation in the same year and continued in their prestigious and profitable positions as directors of one of the world's premier investment banking and financial services firms.

117.    Plaintiff has not made any demand on the present Board of Directors of Morgan Stanley to institute this action because such demand would be a futile and useless act for the foregoing and following reasons:

(a)    In order to bring this action for breach of fiduciary duty, abuse of control and committing corporate waste, the members of Morgan Stanley's Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the corporation, who are their good friends and with whom they have current and prior business relationships, social and charitable relationships and entangling financial alliances.  The Director Defendants' ongoing and prior business relationships, inside and outside Morgan Stanley, and on-going social relationships prevented the Board members from taking positions contrary to defendant Purcell and ensured that defendant Purcell's power, domination and control over the Board remained absolute.  These relationships include:

(i)    When the first signs of a shareholder revolt unfolded following the December 9, 2004 Sipprelle letter, defendant Purcell brought defendant Brennan, his long-time mentor from Sears, back on the Board even though, at age 71, defendant Brennan was past the mandatory retirement age of 70 for the Board members.  Defendant Brennan's reappointment to the Board was not submitted to the Company's shareholders for approval.  The reason defendant Purcell

failed to seek shareholder approval was that approval was unlikely given that the only reason defendant Brennan was brought back on the Board was to help defendant Purcell maintain power.

(ii)     **Dean Witter:**  Defendant Purcell now shares the Board with four other former Dean Witter directors: defendants Brennan, Marsh, Miles and Kidder.

(iii)     **Sears Roebuck:**  Defendant Brennan is the former Chairman, President and Chief Executive Officer of Sears who asked defendant Miles to join the Sears Board in 1992.  While at Sears, defendant Brennan was a mentor to defendant Purcell who reported to him. Defendant Purcell started the Discovery credit card under defendant Brennan at Sears and spun it off with Dean Witter with Discover in 1993.  Additionally, defendant Miles was formerly Chairman of the Board at Sears.

(iv)     **Kraft Foods:**   While chairman of the nominating committee, defendant Miles recruited and nominated two directors who formerly worked under him at Kraft Foods.  These directors include defendants Marsh and Kidder.  Defendant Brennan also served on the Kraft Foods Board.

(v)     **McKinsey & Co.:**  Defendant Purcell shares the Board with four other directors who were also partners at the international consulting firm McKinsey & Co.  These directors include defendants Davies, Kidder, Marsh and Zumwinkel.

(vi)     **Other Boards:**  A number of the defendants also serve together on other boards, which further restricts directors from taking contrary positions:  **AMR Corp.:** defendants Purcell, Miles and Brennan serve on the AMR Corp. Board together; **SBC Corp.:** defendant Knight serves on five boards including SBC Corp. with defendant Tyson; **Anheuser-Busch:** defendants Knight and Jacob serve together on the Anheuser-Busch Board.

(vii)        **Other CEOs:** In addition to defendant Purcell, defendants Knight, Marsh, Kidder, Brennan and Madigan are or were all CEOs.

(viii)        **Chicago and the Midwest Connections:**  Defendant Purcell still maintains his residence in the Chicago area and commutes to New York.  Incredibly, none of the other directors, except defendant Crawford, who was added to the Board on April 4, 2005, reside in New York.  In fact, most reside in Chicago or the Midwest.  Along with defendant Purcell, defendants Brennan, Madigan, Marsh and Miles reside in the Chicago area.  Defendants Jacob and Knight reside in St. Louis and defendant Kidder resides in New Albany, Ohio.

(ix)        **Augusta National Golf Club:** Defendant Purcell, who regularly used the Morgan Stanley jet to travel to play golf at Augusta also serves with other directors who are member of Augusta.  These include defendants Knight and Brennan.

Based on these relationships and connections, the Director Defendants would not be able to vigorously prosecute any such action.

(b)        Defendant Purcell used Morgan Stanley's jet to incur expenses for $467,142 in personal use in 2004.  This amount represents only a fraction of the actual cost incurred by Morgan Stanley in allowing defendant Purcell to use the Company jet for golf outings at Augusta or even to commute from Chicago, which defendant Purcell does every week.  Further, defendant Purcell allowed members of the Board to have personal use of the corporate jet.  In fact, on March 2, 2003, *The New York Times* reported on the Board's personal use of the jet and defendant Purcell's comment, "the most important thing I have to do is to keep *my* Board happy."

(c)        Only after Cruz and Crawford were added to the Board on April 4, 2005 did the Morgan Stanley Board remove the super-majority 75% vote requirement that had protected defendant Purcell since the 1997 merger.

(d)     The members of the Morgan Stanley Board, each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and vesting of control over the Board to defendant Purcell.  They have thus benefited from their breaches of fiduciary duty, duty to care, due diligence and to preserve corporate assets, and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  Given the Board members' close personal and business ties with each other, they are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves.

(e)     The Board members authored and signed the false 2005 Morgan Stanley Proxy Statement and will not sue themselves for their own false Proxy Statement.

(f)     The Morgan Stanley directors' and officers' liability insurance policies have an "insured vs. insured" exclusion.  Thus, if the Morgan Stanley directors cause the company to sue themselves for the liability asserted in this case they would not be insured for that liability.  They will not do this to themselves.  The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company.  This derivative suit does not trigger the "insured vs. insured" exclusion, and thus, only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit Morgan Stanley.

(g)     The entire Board of Directors breached their duties of care, oversight and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets including the duty not to commit corporate waste.

(h)     The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification.

(i)     The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Morgan Stanley Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action.

118.    Plaintiff has not made any demand on Morgan Stanley shareholders to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Morgan Stanley is a publicly traded company with approximately 1.09 billion shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

119.    Plaintiff brings this action derivatively in the right and for the benefit of Morgan Stanley to redress damage suffered and to be suffered by Morgan Stanley as a direct result of defendants' breaches of fiduciary duty, corporate mismanagement, unjust enrichment and abuse of control.  This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have.  Plaintiff will adequately and fairly represent the interests of Morgan Stanley and its shareholders in enforcing and prosecuting their rights.

120.    As part of the Director Defendants' complete abdication of power to defendant Purcell, the scheme to conceal information from reaching shareholders and their allowing defendant Purcell unfettered discretion to take any and all steps to protect his position at the firm and his domination over the Board, they proclaimed that they had strong support from management for Purcell's management shakeup.  The Director Defendants made the claim despite the loss of 5 of 14

members of the firms' management committee and dozens of the firms' current and future leaders of the investment bank division. The Director Defendants' assertions of strong support for the restructuring are further belied by the hundreds of millions of dollars Morgan Stanley has had to pay to prevent further departures of talented professionals.

121.    The Sarbanes-Oxley Act placed significant additional responsibilities on the Boards of Directors of public companies subject to the Act, like Morgan Stanley, to improve corporate governance, corporate financial responsibility, disclosure and integrity. This law is a disaster for the Morgan Stanley Board as the Company is dominated by defendant Purcell and plagued by his destructive need for secrecy and obsession with retaining power. Any real compliance with Sarbanes-Oxley would have exposed Morgan Stanley's legal department and regulatory compliance office's woefully lacking internal controls or even worse that these departments were intentionally obfuscating discovery and engaging in dangerous hard-ball litigation tactics to conceal damaging evidence in e-mail. Any real compliance with Sarbanes-Oxley would also reveal that defendant Purcell will do whatever it takes to retain power regardless of what havoc his conduct has on the Morgan Stanley brand name, including causing hundreds of millions of dollars in corporate waste by having to pay lavish retention bonuses to keep employees and civil damages from perpetuating a fraud and then trying to cover it up. Thus, the Morgan Stanley Board did not enforce or comply with Sarbanes-Oxley, despite their legal obligation under U.S. law. They will not sue themselves for these failures.

122.    Any request or demand upon the Morgan Stanley Board that they sue themselves for the damage that their misconduct has caused would be futile and useless, as it is obvious that they will not do so. In fact, Morgan Stanley's *modus operandi* of delaying, obfuscating and concealing is evidence that the Board will not investigate its own failings to oversee the Legal Department, the

purge of executives or Purcell's efforts to protect himself from attack at all costs.  The Director Defendants will not sue themselves because it would require them to acknowledge that defendant Purcell, who hand picked them to be on the Board, is a failed CEO only concerned with protecting his lucrative position.  Another reason the directors will not sue themselves is that by suing themselves, these individuals would void any directors' and officers' liability insurance coverage otherwise available to them, as such policies include the so-called "insured vs. insured" exclusion, by which a suit brought by or on behalf of the Company against them would not be covered by the insurance and thus would expose these individuals to ruinous personal liability.

**General Counsel Kempf's and Kirkland & Ellis's Professional Negligence/Legal Malpractice**

123.    General Counsel Kempf was hand-picked by defendant Purcell in 1999 in a move which further demonstrates Purcell's excessive cronyism.  Defendant Kempf was a senior litigation partner at Kirkland & Ellis who also happened to be Purcell's neighbor in a Chicago suburb and the hockey coach of his children.  Defendant Kempf's hard-nosed style often rubbed the SEC and other regulators with whom Morgan Stanley had to deal the wrong way.

124.    During his tenure with Morgan Stanley, along with defendant Purcell, defendant Kempf developed a strategy to delay, obfuscate and just plain hide relevant evidence combined with a very strident, never-settle litigation posture.

125.    As time went by, these attributes weighed very heavily on Morgan Stanley as Purcell's and Kempf's tactics, combined with their never-settle posturing, got Morgan Stanley into trouble over and over.  As discussed above, Morgan Stanley repeatedly flaunted state and federal laws specifically enacted to require investment banks to retain e-mail.  These laws were enacted to combat this exact practice developed by Morgan Stanley to frustrate litigation opponents by claiming relevant communications such as e-mail could not be produced.

126.     In response to this problem, state and federal regulators, including the SEC, required investment banks to retain e-mail.  Despite these rules, Morgan Stanley nonetheless continued to stick to the older strategy of claiming e-mail could not be produced.

127.     Defendants Purcell's and Kempf's tactics proved costly to Morgan Stanley, as the Company was sanctioned and fined repeatedly for failure to comply with e-mail retention laws.  As set forth above, well before the epic discovery battles in the Coleman/Sunbeam litigation, Morgan Stanley was fined repeatedly and was even forced to enter into a consent decree with the SEC in 2002 in which it agreed not to violate federal e-mail retention laws.

128.     Despite this history and the SEC consent decree, defendant Kempf and his former law firm, defendant Kirkland & Ellis, at Kempf's instruction, deployed a scorched earth litigation strategy of delay, and obfuscation, combined with wholesale hiding and destruction of evidence.  Furthermore, despite the facts which tended to indicate Morgan Stanley was directly involved in the fraud on Perelman, defendants Kempf and Kirkland & Ellis were so confident in their delay, hide and destruction strategy that they never bothered to evaluate the merits of Perelman's claims or fully explain the risks of refusing to settle.  Defendants Kempf and Kirkland & Ellis also failed to explore what impact their hide and destroy ploy would have if they got caught.  As a result of these failures, defendants Kempf and Kirkland & Ellis never explained to Morgan Stanley's upper management or Board of Directors that the facts in the Perelman case posed considerable risk to Morgan Stanley. Similarly, defendants Kempf and Kirkland & Ellis never explained how a court would perceive a hide and destroy strategy in combination with facts suggesting Morgan Stanley's culpability.  These failures by defendants Kempf and Kirkland & Ellis proved devastating to Morgan Stanley and resulted in the $1.5 billion Florida verdicts.

129.    As set forth above, Morgan Stanley's strategy, implemented by Purcell, Kempf and Kirkland & Ellis to hide and destroy evidence for over two years in the Florida court caused disastrous consequences.  With the facts of the Perelman case showing that Morgan Stanley was aware of the deteriorating condition of Sunbeam just before the transaction closed, the Florida court had no other choice than to conclude the Company participated in the fraud because it flagrantly violated one court order after another requiring it to produce evidence relevant to key issues in the case.  The Florida court instructed the jury to assume that Morgan Stanley defrauded Perelman precisely because of the hard-ball hide and destroy tactics implemented by Kempf and his former law firm, Kirkland & Ellis.

130.    Given the facts of the Coleman/Sunbeam case implicating Morgan Stanley, and Purcell's, Kempf's and Kirkland & Ellis's knowledge that they were pursuing a hide and destroy strategy, it appeared that a settlement of the Perelman litigation was worthy of consideration.  When senior management, however, asked Kempf and Kirkland & Ellis for advice regarding settlement, these defendants were so confident in their hide and destroy tactics that they told upper management Perelman's case was weak.  For this reason, Morgan Stanley refused an offer to settle the Perelman litigation in 2003 for $20 million.

## FIRST CLAIM FOR RELIEF
### Against the Director Defendants, Except Defendant Mack, for Violations of §14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    During the relevant period, the Director Defendants named in this claim disseminated the false and misleading February 15, 2005 Proxy Statement specified above which they knew or recklessly disregarded was misleading in that it contained misrepresentations and failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

133.    The February 15, 2005 Proxy Statement was prepared and disseminated by the Director Defendants named in this claim, individually and in concert.  The Proxy was distributed by means of instrumentalities of interstate commerce and/or of the mails and misrepresented the true nature of Morgan Stanley's continuous failure to comply with federal law requiring the retention of critical e-mails.  The February 15, 2005 Proxy failed to disclose the "Wells Notice" the Company received in January 2005 indicating that Morgan Stanley was again violating federal law requiring it to retain e-mail and which recommended that an action be commenced to remedy Morgan Stanley's continuous flaunting of e-mail retention laws.  Instead of disclosing these continuous violations and the "Wells Notice," the Director Defendants gave themselves enormous raises, including an award of 4,000 shares of common stock, and re-elected the Director Defendants up for re-election in 2005 as dictated in the February 15, 2005 Proxy, and in so doing made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 promulgated thereunder.

134.    The Director Defendants named in this claim knowingly, recklessly or negligently disregarded that the February 15, 2005 Proxy Statement at issue was materially false and misleading and participated in the issuance or dissemination of said Proxy Statement as primary violators of the federal securities laws.

135.    The Director Defendants knew or were reckless in not knowing of the true facts about the Company's continuous tactic to not produce critical evidence contained in e-mails, to routinely and repeatedly flaunt federal law requiring the preservation of such e-mails and that the SEC had

sent the Company a "Wells Notice" informing Morgan Stanley it was violating an early consent decree in which the Company had agreed to not violate federal law requiring that e-mail be retained. Each of the Director Defendants named in this claim, by virtue of their responsibilities and positions, had significant contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations, financial condition and performance at all relevant times.  As a result of this access and the repeated nature of Morgan Stanley's flaunting of federal law, the Director Defendants knew that the SEC "Wells Notice" was extremely damaging evidence of their failure to remedy a systemic pattern by the Company to refuse to comply with federal law.  However, notwithstanding this knowledge, each of the Director Defendants misrepresented and/or omitted material facts as set forth herein.

136.    As a result of the Director Defendants' misconduct, Morgan Stanley has and will suffer damages because the Director Defendants have been permitted to illegally entrench themselves through huge raises for serving as directors, as a result of the enormous $1.5 billion jury verdicts in the Coleman/Sunbeam litigation in Florida and as a result of exposing Morgan Stanley to additional civil fines and penalties for continuously flaunting federal law requiring e-mails to be retained.  Absent the false and misleading statements in the relevant proxy statements, the majority of the shareholders who were unaware of untruths and relied thereon would not have voted as they did.  As such, Morgan Stanley's damages were directly and proximately caused by the Director Defendants' wrongful conduct.  By reason of such misconduct, the Director Defendants are liable pursuant to §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

### SECOND CLAIM FOR RELIEF
**Derivatively Against the Director Defendants and Defendant Kempf for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

137.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.     During the Relevant Period, the Director Defendants and defendant Kempf prepared, disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.     Defendant Purcell received over 650,000 shares of restricted stock from Morgan Stanley as part of his exit payments.  Morgan Stanley was damaged by the payment of these shares because, if terminated for cause, defendant Purcell would not have received any of these shares. Moreover, the payment of these shares to Purcell was made when he was in breach of his fiduciary obligations to the Company and as a result of his failure to manage the affairs of the Company in the best interests of Morgan Stanley and its shareholders.  The Director Defendants, except Mack, also received an award of 4,000 shares of Morgan Stanley common stock for service on the Board in 2004.  These defendants received this award of stock at the same time they were in breach of their fiduciary obligations to ensure that Morgan Stanley was not subject to a waste of corporate assets, was in compliance with federal law and operated in a manner consistent with the Company's not the directors' best interests.  This award of common stock was also made when the Board knew that the Company was in continuous violation of a consent decree with the SEC from 2002 under which Morgan Stanley had been fined and agreed to cease and desist its practice of failing to retain e-mail.

140.     At the same time the price of the Company's common stock was inflated by the Director Defendants' and defendant Kempf's misstatements and the Director Defendants, except

Mack, received their stock awards, the Director Defendants were causing Morgan Stanley to repurchase its own stock on the open market at inflated prices.  From 2001 to May 31, 2005, Morgan Stanley repurchased millions of shares of its common stock at artificially inflated prices.  For example, during 2005, after Morgan Stanley had received the "Wells Notice," the Company repurchased shares from January through April 2005 as follows:

| Month | Total Shares Repurchased |
|---|---|
| January 2005 | 16,747,182 |
| February 2005 | 6,506,373 |
| March 2005 | 8,093,082 |
| April 2005 | 4,251,600 |

141.   As such, the Director Defendants and defendant Kempf violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)   Employed devices, schemes and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Morgan Stanley and others in connection with their purchases of Morgan Stanley common stock during the relevant period.

142.   As a result of the Director Defendants' and defendant Kempf's misconduct, Morgan Stanley has and will suffer damages in that it paid artificially inflated prices for Morgan Stanley common stock purchased on the open market.  Morgan Stanley would not have purchased Morgan Stanley common stock at the prices it paid, had the market been aware that the market price of

Morgan Stanley's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Morgan Stanley suffered damages in connection with its purchases of Morgan Stanley common stock during the relevant period.  By reason of such conduct, the Director Defendants and defendant Kempf are liable pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

**THIRD CLAIM FOR RELIEF**
**Against the Director Defendants for Intentional and/or Negligent**
**Breach of Fiduciary Duties of Care, Loyalty and Good Faith**

143.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

144.    As alleged in detail herein, each of the Director Defendants had a duty to Morgan Stanley and its shareholders to, *inter alia*, ensure that the Company was operated in a diligent, honest and prudent manner.

145.    Plaintiff asserts this claim derivatively on behalf of Morgan Stanley against all of the Director Defendants.

146.    The Director Defendants have breached their fiduciary duties of care, loyalty and good faith owed to Morgan Stanley and its stockholders by subordinating the best interests of Morgan Stanley by agreeing to the unconscionable terms of the exit agreements of defendants Purcell and Crawford.

147.    The negotiations between the Director Defendants, on the one hand, and Purcell and Crawford, on the other, presented an ideal opportunity for Morgan Stanley to terminate Purcell's employment in a manner that would not result in a waste of Morgan Stanley's assets or a breach of the fiduciary obligations owed by the Director Defendants to Morgan Stanley.  Rather, the Director Defendants chose to reward defendants Purcell and Crawford for failure with no added benefit to Morgan Stanley.

148.    By reason of the decision to pay Purcell $77.4 million and Crawford $32 million, Morgan Stanley has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

149.    Plaintiff and Morgan Stanley have no adequate remedy of law.

### FOURTH CLAIM FOR RELIEF
### Against the Director Defendants for Corporate Waste

150.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

151.    Plaintiff alleges this claim on behalf of Morgan Stanley against all of the Director Defendants.

152.    Each of the Director Defendants owes and owed to Morgan Stanley the obligation to protect Morgan Stanley's assets from loss or waste.

153.    As specified above, by any objective assessment, the payments to defendants Purcell and Crawford as a result of their resignations are grossly excessive and bear no relation to the value of the purported services Purcell and Crawford have provided.

154.    The Director Defendants' approval of these payments given Purcell's track record and Crawford's prior positions constituted a waste of Morgan Stanley's corporate assets and was grossly unfair to Morgan Stanley.  The Director Defendants, having agreed to pay defendant Purcell $77.4 million and defendant Crawford $32 million, without securing any new benefit to Morgan Stanley, wasted and squandered Morgan Stanley's assets.  Thus, no person of ordinary, sound business judgment could conclude that the Director Defendants' decisions to approve these payments, especially given Morgan Stanley's sub-standard performance, massive brain drain and huge legal verdicts, represented a fair or reasonable exchange.  Furthermore, no person could conclude that paying defendant Crawford $32 million when he only stood to make $10 million in 2005 was fair or

reasonable.  The Morgan Stanley Board did not obtain the objective advice of any independent consultant or expert as to the wisdom or propriety of these payments or the validity and value of the corporate causes of action they were releasing as part of these payoffs.

155.    By reason of the foregoing, Morgan Stanley has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

156.    Plaintiff and Morgan Stanley have no adequate remedy at law for the wasteful and wrongful conduct engaged in by the Director Defendants.

157.    Plaintiff and Morgan Stanley are therefore entitled to judgment against the Director Defendants as specified below.

**FIFTH CLAIM FOR RELIEF**
**Against the Director Defendants for a Declaratory Judgment**

158.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

159.    Plaintiff asserts this claim derivatively on behalf of Morgan Stanley against all of the Director Defendants.

160.    As is alleged in detail above, the terms of the exit agreement to pay defendant Purcell $77.4 million and defendant Crawford $32 million are oppressive and unfair and amount to a breach of the fiduciary duties of care, loyalty and good faith owed by the Director Defendants to Morgan Stanley.  The Director Defendants voted in favor of the exit agreements and/or ratified them and/or authorized or engaged in the effort to enter into the agreements and/or failed to take steps to prevent them, although they amounted to a waste of Morgan Stanley's assets and a breach of the fiduciary obligations the Director Defendants owed to Morgan Stanley.

161.    Any actions undertaken by the Director Defendants in voting for or ratifying the exit agreements were invalid because of the patently wasteful and unconscionable nature of those payments.  Accordingly, these exit agreements were void, *ab initio*, and contrary to law.

162.    Plaintiff is therefore entitled to a declaratory judgment, declaring the exit agreements void, *ab initio*.

### SIXTH CLAIM FOR RELIEF
### Against Defendants Purcell and Crawford for
### Aiding and Abetting Breaches of Fiduciary Duty and Corporate Waste

163.    Plaintiff repeats each allegation set forth above and further alleges as follows.

164.    This claim is brought against defendants Purcell and Crawford in their capacity as individuals, not as directors or officers, of Morgan Stanley.  Purcell and Crawford knew or recklessly disregarded that the Director Defendants' authorization to pay defendant Purcell $77.4 million and defendant Crawford $32 million constituted corporate waste and a breach of the Director Defendants' fiduciary duties.

165.    Purcell and Crawford substantially assisted the Director Defendants' commission of these wrongful acts by demanding and accepting the $109.4 million in payments authorized by the Director Defendants.

166.    Morgan Stanley has been damaged by Purcell's and Crawford's aiding and abetting these wrongful acts by the Director Defendants.

### SEVENTH CLAIM FOR RELIEF
### Against Defendants Purcell and Crawford
### for Unjust Enrichment and Constructive Trust

167.    Plaintiff repeats each allegation set forth above and further alleges as follows.

168.    This claim is brought derivatively on behalf of Morgan Stanley against defendants Purcell and Crawford in their individual capacities and not as directors or officers of Morgan Stanley.

- 82 -

169.    The $77.4 million payment to defendant Purcell and $32 million payment to defendant Crawford were not justified by any legitimate purpose, were made in return for little or no consideration to Morgan Stanley, and were given in return for something so inadequate in value that no person of ordinary, sound business judgment would deem it worth what Morgan Stanley paid.

170.    The $109.4 million payments to defendants Purcell and Crawford unjustly enriched them.

171.    Morgan Stanley has been damaged by this unjust enrichment of defendants Purcell and Crawford.

172.    A constructive trust should be imposed over the $77.4 million paid to defendant Purcell and $32 million to defendant Crawford.

## EIGHTH CLAIM FOR RELIEF
### Against Defendants Purcell and Crawford for Rescission

173.    Plaintiff repeats each allegation set forth above and further alleges as follows.

174.    This claim is brought derivatively on behalf of Morgan Stanley against defendants Purcell and Crawford in their individual capacities and not as directors or officers of Morgan Stanley.

175.    The Director Defendants exceeded their authority and breached their fiduciary duties in approving, negotiating, and authorizing the buyout payments of $77.4 million to defendant Purcell and $32 million to defendant Crawford.

176.    The payments to defendants Purcell and Crawford should be rescinded.

## NINTH CLAIM FOR RELIEF
### Against the Director Defendants for Abuse of Control

177.    Plaintiff incorporates by reference each and every allegation contained above, as though fully set forth herein.

178.    The Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Morgan Stanley, for which they are legally responsible.

179.    As a direct and proximate result of the Director Defendants' abuse of control, Morgan Stanley has sustained significant damages.

180.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

181.    Plaintiff on behalf of Morgan Stanley has no adequate remedy at law.

## TENTH CLAIM FOR RELIEF
### Against the Director Defendants for Gross Mismanagement

182.    Plaintiff incorporates by reference each and every allegation contained above, as though fully set forth herein.

183.    By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Morgan Stanley in a manner consistent with the operations of a publicly held corporation.

184.    As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, Morgan Stanley has sustained significant damages in excess of $109 million.

185.    As a result of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

186.    Plaintiff on behalf of Morgan Stanley has no adequate remedy at law.

## ELEVENTH CLAIM FOR RELIEF
### Against Defendants Kempf and Kirkland & Ellis for Professional
### Negligence and Legal Malpractice

187.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

188.    Defendant Kempf served as general counsel to Morgan Stanley from 1999 to July 18, 2005.  Defendant Kirkland & Ellis, defendant Kempf's former law firm, served as outside litigation counsel in the Coleman/Sunbeam litigation to Morgan Stanley.  As attorneys for Morgan Stanley, defendants Kempf and Kirkland & Ellis owed Morgan Stanley a duty of reasonable care, skill and diligence.

189.    Defendants Kempf and Kirkland & Ellis breached this duty of care, skill and diligence when they informed Morgan Stanley's upper management and Board of Directors that Perelman had a very weak case in the litigation involving Coleman and Sunbeam and instead chose to rely on their continuous pattern of delay, obfuscation and hiding relevant evidence by falsely stating or causing Morgan Stanley employees to state that the Company had searched for and produced all relevant e-mails that could be located.  Defendants Kempf and Kirkland & Ellis negligently disregarded that Morgan Stanley was violating federal laws and a prior consent decree with the SEC when they stated that Perelman's case was weak.  Defendants Kempf and Kirkland & Ellis negligently disregarded that Morgan Stanley had neither conducted an adequate search for nor produced all relevant e-mails that could be located.  Defendants Kempf and Kirkland & Ellis also breached their duty of care, skill and diligence when they failed to inform Morgan Stanley's upper management and Board that despite their belief that Perelman's case for fraud was weak, a court might make adverse inferences based on Morgan Stanley's continuous pattern of lying about its e-mail capabilities and refusal to comply with court orders.

- 85 -

190.     Defendants Kempf and Kirkland & Ellis also breached their duties of care, skill and diligence by engaging in hard-ball litigation tactics to the point where it appeared that Morgan Stanley in delaying and obfuscating discovery was trying to hide its involvement in a conspiracy to defraud Perelman.

191.     But for defendants Kempf's and Kirkland & Ellis's ill-advised practice of obfuscation and delay and misplaced reliance on hard-ball litigation tactics as a winning trial strategy, Morgan Stanley's upper management and Board of Directors would have genuinely been presented with and undertaken careful consideration of the $20 million settlement offer made by Perelman in 2003. Further, but for defendants Kempf's and Kirkland & Ellis's hard-ball litigation tactics and continuous pattern of refusing to comply with federal law regarding e-mail and relying on obfuscation and delay, Morgan Stanley would have known that it should have seriously considered Perelman's $20 million offer.

192.     Because of these illegal practices by defendants Kempf and Kirkland & Ellis, these defendants negligently disregarded that Morgan Stanley would be sanctioned for failure to comply with court orders and that such failure would lead to an inference that Morgan Stanley was attempting to hide that it had actively conspired to defraud Perelman.

193.     Defendants Kempf's and Kirkland & Ellis's negligent disregard for what impact their hard-ball tactics, delay and obfuscation would have on Morgan Stanley's upper management and Board's willingness to discuss settlement and adverse consequences in the trial court presiding over the Coleman/Sunbeam litigation were the proximate cause of Morgan Stanley having $1.58 billion in verdicts rendered against it in the Perelman trial.  But for these practices, Morgan Stanley would have settled or at a minimum would have not received the adverse instruction to the jury hearing the case that it actively participated in the fraud.  Without that instruction, the compensatory award of

$680 million would have been lowered and the $800 million punitive award would not have occurred.

194.     As a result of defendants Kempf's and Kirkland & Ellis's negligence, Morgan Stanley has suffered damages in excess of $1.5 billion.

195.     As a result of defendants Kempf's and Kirkland & Ellis's continuous practices of delay, obfuscation and blatant refusal to comply with federal law, consent decrees with the SEC and discovery obligations in thousands of broker dealer cases, Morgan Stanley has been exposed to further civil penalties and fines.

196.     Morgan Stanley relied to its detriment on defendants Kempf and Kirkland & Ellis and was damaged thereby.

197.     As a direct, foreseeable and proximate result of defendants Kempf's and Kirkland & Ellis's breach of duties owed to Morgan Stanley, it was damaged.

## TWELFTH CLAIM FOR RELIEF
**Against Defendants Kempf and Kirkland & Ellis for Aiding and Abetting
Breaches of Fiduciary Duty, Abuse of Control,
Unjust Enrichment and Gross Mismanagement**

198.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

199.     Defendants Kempf and Kirkland & Ellis aided and abetted the Director Defendants in breaching their fiduciary obligations owed to Morgan Stanley resulting in the wrongdoing and damages to those entities complained of herein.  Defendants Kempf and Kirkland & Ellis knew or should have known that the Company's repeated descriptions of its legal matters within its SEC filings were false and misleading and contained material omissions because the Company failed to disclose that it was in continuous violation of federal law and its own consent decrees negotiated with the SEC requiring Morgan Stanley to retain e-mail.  Instead of disclosing these continuous

violations, defendants Kempf and Kirkland & Ellis relied on their hard-ball litigation tactics to hide relevant evidence. Defendants Kempf and Kirkland & Ellis also knew, or should have known, that the false and misleading information would be used, in whole or in part, by Morgan Stanley to prepare its publicly reported quarterly and annual reports. Nevertheless, defendants Kempf and Kirkland & Ellis actively prepared the false and misleading information and thereby aided and abetted defendants' breaches of fiduciary duty and their abuse of control, gross mismanagement and violation of their duty not to commit waste to Morgan Stanley and its shareholders complained of herein.

200.    As a direct, foreseeable and proximate result of defendants Kempf's and Kirkland & Ellis's aiding and abetting of defendants' breaches of fiduciary duty, Morgan Stanley has been damaged.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment in its favor and in favor of Morgan Stanley against all of the defendants as follows:

A.    Declaring that the Director Defendants have violated their fiduciary duties to Morgan Stanley and have wasted Morgan Stanley's assets;

B.    Declaring that the exit payments of $77.4 million to defendant Purcell and $32 million to defendant Crawford are null and void because they amount to a waste of Morgan Stanley's assets and a breach of the Director Defendants' fiduciary duties of care, loyalty and good faith;

C.    Declaring that all defendants as alleged herein were unjustly enriched;

D.    Requiring defendants to pay Morgan Stanley the amounts by which the Company has been damaged by reason of the conduct complained of herein;

E.      Declaring void the votes of the stockholders for the election of directors and the amendment of executive compensation plans at the 2005 annual meeting of shareholders;

F.      Issuing a mandatory injunction requiring that the Company's future proxy statements contain fair and adequate disclosure concerning the compensation of its officers and directors;

G.      Issuing a mandatory injunction requiring defendants to establish and implement a fair and reasonable compensation arrangement for officers and directors of Morgan Stanley;

H.      Enjoining the Director Defendants and all other persons from undertaking any steps to abide by the terms of the Purcell and Crawford exit agreements;

I.      Enjoining defendants Purcell and Crawford from taking any steps to receive remuneration pursuant to their exit agreements;

J.      Ordering the Director Defendants to account for all damages caused by them and all profits and unjust enrichment obtained as a result of their unlawful conduct and imposing a constructive trust thereon;

K.      Granting equitable and/or injunctive relief to freeze or sequester or impose a constructive trust over any salary, bonus, shares, options or other compensation paid or to be paid to defendants Purcell and Crawford in connection with their departure agreements until the instant action is resolved and/or granting permanent relief;

L.      Void any secrecy or speak "no ill" provision in departure agreements with departed executives;

M.      Require disgorgement of all legal fees paid to Kirkland & Ellis in the past four years, plus all amounts required to resolve or satisfy the judgment in the Coleman/Sunbeam case beyond $20 million;

N.      Granting rescission, awarding compensatory, rescissory or punitive and exemplary damages against the defendants jointly and severally in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

O.      Awarding plaintiff the costs and disbursements of this action, including a reasonable allowance for the plaintiff's attorneys' and experts' fees, costs and expenses; and

P.      Granting such other or further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 19, 2005

LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
MARIO ALBA, JR. (MA-7240)


_____
             SAMUEL H. RUDMAN

200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
HENRY ROSEN
401 B Street, Suite 1600
San Diego, CA  92101-4297
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

## VERIFICATION

I, Samuel H. Rudman, hereby declare as follows:

I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

I make this Verification because plaintiff is absent from the County of Suffolk, where I maintain my office.

Executed this 19th day of July, 2005, at Melville, New York

SAMUEL H. RUDMAN